## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **SCA PHARMACEUTICALS, LLC,** | |
| Plaintiff, | |
| v. | Civil Action No. <u>3:23-CV-1462</u> |
| **U.S. FOOD AND DRUG ADMINISTRATION**, **XAVIER BECERRA**, in his official capacity as Secretary of Health and Human Services, **DR. ROBERT M. CALIFF**, in his official capacity as Commissioner of Food and Drugs, | **VERIFIED COMPLAINT** |
| Defendants. | |

Jeffrey P. Mueller
**DAY PITNEY LLP**
Goodwin Square, 225 Asylum St,
Hartford, CT 06103
(860) 275-0100

OF COUNSEL:
Derek L. Shaffer*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

Alex H. Loomis*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100

*Attorneys for Plaintiff, SCA Pharmaceuticals, LLC.*

---

* *Pro hac vice* application forthcoming.

Plaintiff SCA Pharmaceuticals, LLC ("SCA") alleges as follows:

## NATURE OF ACTION

1.      SCA is a leading pharmaceutical compounder that delivers the highest-quality sterile injectable and/or infusible pharmaceuticals in ready-to-administer dosages for use at hospitals and healthcare facilities nationwide.   SCA prides itself on being the most customer- and patient-focused FDA-registered Section 503B compounding facility in the industry.

2.      SCA operates two state-of-the-art compounding facilities that meet and exceed United States Food and Drug Administration ("FDA") current good manufacturing standards. SCA's main facility, in Windsor, Connecticut (the "Windsor Facility"), boasts more than 90,000 square feet of sterile compounding laboratory, manufacturing, and warehousing space.   The Windsor Facility employs just under 400 people in the greater Hartford area.   SCA's second facility is a 17,000-square-foot sterile compounding facility located near SCA's Little Rock, Arkansas headquarters ("Little Rock Facility").   SCA employs about 145 people in the Little Rock Facility, as well as a team of sales representatives around the country.

3.      SCA has been widely praised for its contributions to Connecticut.   Governor Daniel P. Malloy, in 2017, lauded SCA for opening the Windsor Facility, stating he was "thrilled that this company is adding hundreds of good, high-quality jobs in our state."[1]   SCA's presence, Lieutenant Governor Nancy Wyman stated, "further establish[es] Connecticut as a global competitor in bioscience and healthcare."[2]

---

[1]      Press Release, *Gov. Malloy Announces Pharmaceutical Company Opening Manufacturing Facility in Windsor That Will Create 361 New Jobs*, CT.GOV (May 9, 2017), https://perma.cc/8N8E-XKGJ.

[2]      *Id.*

4.      But SCA's ability to continue operating as a business now faces an imminent, existential threat from a federal agency that is acting without warrant, without standards, without explanation, and without answering to judicial review.   The FDA has ordered SCA effectively to shut down its Windsor Facility and recall tens-of millions-of-dollars-worth of product distributed from there, despite finding no deviations from regulatory guidelines or any unsanitary conditions likely to taint products coming from that facility.   That would cripple SCA's business.   If SCA fails immediately to acquiesce, however, then FDA will subject SCA to scathing public condemnation via a statutory notification that explicitly directs customers and patients to refrain from using any of SCA's medications.   That, too, would amount to a death sentence for SCA.

5.      No such result is consonant with fairness or public health.   Were the agency permitted to orchestrate its Catch-22 with SCA, it would destroy SCA's business and force it into bankruptcy, SCA's customers would lose access to medications subject to nationwide shortages, hospitals would be forced to make up for the shortages by compounding medicines themselves in less sterile and less regulated environments (including at patients' bedsides, which, of course, lack sufficient sterility protections), and hundreds of employees will be denied continuing employment.

6.      For a four-week period from September and October of this year, the FDA sent a team to inspect SCA's Windsor Facility.   Throughout their month-long investigation, FDA officials raised no critical safety concerns while they were on-site.   To the contrary, they repeatedly commented to SCA employees that they could tell that SCA "spent a lot of time developing [its] program" for environmental monitoring and that any adverse technical observations that might later appear in FDA's report would "not be indicative of" of the inspectors' positive experience at SCA.

7.      On October 20, 2023, the inspectors issued a "483" report containing ten negative observations, each of which related to alleged technical issues at the facility.    Among other things, the inspectors claimed that computer controls "to assure that changes in master production and control records" could be accessed by non-authorized personnel and that SCA, while discarding products that had technical minor defects, did not further investigate every single defect spotted in every single product.

8.      The inspectors' observations did not identify any problem that inspectors observed for any actual medication produced by SCA and certainly did not suggest that anyone was harmed by SCA's medications.    Rather, the 483 report faulted SCA for failing to ensure that its quality control *investigation* practices met *non-binding* FDA guidance.    Notably, the FDA found *no issues* with these *same practices* when it conducted a 10-day on-site inspection of SCA's Little Rock Facility in May 2023 and issued *that* facility a positive close-out letter.    The inspectors also faulted SCA for minor, isolated, and easily redressable observations relating to certain individual employees who had, in isolated instances, been acting in contravention of SCA standard operating procedures.    Apart from alleging minor, technical defects in three drug labels and documentation practices, which FDA officials had previously assured SCA did not pose "major issues" (and right now do not cite as grounds for demanding the recall), the 483 did not cite a single violation of statute, regulation, or best practices.

9.      A 483 carries no sanction and, according to the form itself, "lists" only "inspectional observations" made "by the FDA representative(s) during the inspection of your facility" and "do not represent a final Agency determination regarding [a company's] compliance."    Instead, it is meant to begin an iterative process.    FDA protections are expansive, redundant, and extraordinarily difficult (if not impossible) for any inspected facility to implement perfectly 100%

of the time throughout a multi-week period (as was spanned by the FDA's inspection of the Windsor Facility).    The FDA's own website states that "firms are encouraged to respond to the FDA Form 483 in writing with their corrective action with supporting documentation within 15 business days from the issuance of the FDA Form 483."[3]    On their final day, the FDA inspectors told SCA that 483s are always "written in a way that never read well," but that would not be "indicative of their experience with [SCA] here," commenting further that SCA had "been great to interact with."

10.    SCA has always been and remains dedicated to meeting the highest standards, both binding and nonbinding.    It intended, and still intends, to adjust its procedures to redress each of FDA's observations.    Accordingly, it began working on a 483 response as soon as it received the 483 letter, formulating both substantive responses to the FDA's observations and concrete plans to ensure that every identified issue would be promptly and fully addressed to FDA's satisfaction. SCA has already started executing these plans and even completed much of its remediation work.

11.    But last Thursday, November 2, 2023, nine business days after it issued the 483 and six business days before SCA's response was due, the FDA short-circuited this process to impose what amounts to the death penalty in this context.    In a telephonic meeting with SCA, citing certain (but not all) of the 483's observations, the FDA recommended that SCA "voluntarily" cease production at the Windsor Facility until achieving compliance with what the FDA considered to be the most serious observations.    It also requested that SCA "voluntarily" recall all products that have yet to expire.    This represents approximately **2.5 million units from 1,200 hospitals, worth**

---

[3]    U.S. FOOD & DRUG ADMIN., *What to Expect after an Inspection: 483s, Responses and Beyond* (Dec. 14, 2022), https://perma.cc/76W7-BV5J.

5

**some $36.5 million**, that are being used by countless healthcare providers and patients around the country.   The FDA gave SCA a 24-hour deadline to agree to the voluntary recall and shutdown.

12.    The FDA has an established, consistent practice for sanctioning firms that refuse to comply with such ultimatums.   Specifically, the FDA implements a statutory procedure for issuing an official public announcement ("Section 705(b) Notice"), on government letterhead, "warning" the public not to use any of the firm's products due to what FDA terms the possibility of "serious and potentially life-threatening infections or death."   The FDA issues these notices under the auspices of its statutory authority to "disseminate[] information regarding . . . drugs . . . in situations involving, in the opinion of the Secretary, imminent danger to health."   21 U.S.C. § 375(b).   When the FDA has previously issued such notices in exercise of this statutory authority, the practical effect has been to shut down the named compounder and render it a pariah—typically driving the manufacturer into bankruptcy or otherwise out of business.

13.    When SCA requested that the FDA give it more time because it was still formulating its 483 response, the FDA refused and demanded that SCA confirm within "24 hours" whether it would agree to the shutdown and expansive, all-encompassing recall.   Trying its best to cooperate, SCA wrote back to FDA this past Friday morning, November 3, confirming that it had "stopped all production and distribution" from its Windsor Facility following its call with FDA, that it had "begun remediation" to address the 483 observations, and that it would not resume production until it had made every effort to address the issues raised in the 483.   SCA reported that it required until Monday, November 6, to respond to the FDA's demand for a broader recall of all unexpired products manufactured at the Windsor site, but communicated that it was eager to engage with FDA further on the issue.   But to make an informed decision, SCA requested that the FDA share the Health Hazard Evaluation ("HHE") that is meant to be FDA's predicate for any

such recall "request."   Without responding to the request for its HHE, FDA that same day "acknowledge[d]" SCA's decision to cease operations while continuing to "recommend that [SCA] immediately recall all sterile drug products."   In apparent preparation for the Section 705(b) notice that FDA is today poised to issue, the FDA requested that SCA "provide a list of all drugs that are currently on the market" that had come from its Windsor Facility, including the "date of production, date of release, [the] number of units released for distribution, [and] the number of units still waiting for distribution."   Earlier this morning, November 6, SCA emailed the FDA to "reiterate our request that FDA please share its HHE so that it can help inform our decision" and to request "additional time so that we can substantively engage as hoped on the modified, agreed scope of a limited recall, including as to the bases for same"; it also asked that the FDA "kindly respond before noon Eastern today, so that we know whether we will be receiving additional time enabling dialogue and information-sharing to continue."   Out of an abundance caution and in an effort to accommodate FDA, however, SCA informed FDA it had initiated a limited recall tailored to the specific batches of products from which isolated particulates had been identified and removed, as reported by the FDA.   To be clear, SCA believes this limited recall is unnecessary— there is no observation that the batches themselves were contaminated, as explained below, only that SCA did not investigate why discrete products within those batches (which were discarded) had failed visual inspection so as to trigger targeted remediation.   Nevertheless, SCA decided to initiate the limited recall for the sake of going above and beyond in ensuring that any potential or perceived defects are addressed   But FDA has not substantively responded, apart from acknowledging receipt of SCA's email.   By all indications (including FDA's established protocols and practices), the FDA right now has a Section 705(b) Notice drafted and set to issue against SCA this afternoon

14.     Without engaging substantively, the FDA has made clear that nothing short of an across-the-board recall of all SCA's unexpired medications will satisfy it.   And the FDA has indicated that, per its standard, dreaded practice, any persisting request by SCA for further engagement or explanation will immediately trigger scathing condemnation of SCA's medications in terms that warn everyone against continuing to use them.

15.     The FDA's impending notice is unfounded and illegal in multiple respects.   To begin, the FDA has made no serious effort to explain or justify its rationale for concluding from its ten observations that *any* SCA medications, let alone *all* of them, pose "imminent danger to health," as the FDA must before passing procedural muster under the Administrative Procedure Act, 5 U.S.C. § 5 *et seq.* ("APA").   ***None of SCA's medications has been identified as contaminated or otherwise posing any demonstrated threat to patients' health***.   And far from being transparent about any operative rationale, as the APA requires, the FDA is taking the *opposite* approach by *withholding* critical particulars in the face of SCA's good-faith requests.   Indeed, a total recall is especially unnecessary given that SCA will initiate a tailored recall

16.     What is more, the FDA's indications to date make clear that it is improperly subjecting SCA to anomalous (albeit yet-to-be specified) standards.   Specifically, the FDA is mischaracterizing minor, isolated, attenuated findings as impugning the integrity of all of SCA's preparations, even though there is no plausible case to be made that its observations—which disregard layers of surrounding protocols and prophylaxis—call into question the safety of any compound.   The only alleged statutory or regulatory violation that FDA observed involved minor omissions on labeling for three drugs, and improper printing and shredding controls for certain documentation.   That is hardly cause for a full nationwide recall.   Tellingly, the FDA did not even cite those two violations—the only claimed violations of any established standard—as a

reason for demanding a recall, and previously assured SCA that these technical violations did not pose "major issues."

17.     SCA had made clear to FDA that it wishes to cooperate completely to ensure that all safety considerations are addressed consistent with best practices, as viewed by the FDA.    But a full recall goes far beyond those needs, would destroy SCA as a business, and would cause substantial patient access issues nationwide.   The Windsor Facility is responsible for 80% of SCA's production and distribution.    A full recall would cost it tens of millions of dollars that it cannot afford, force it to lay-off hundreds of employees (most of whom are in Connecticut), and, ultimately, send it into a death spiral culminating in bankruptcy.

18.     The FDA's edict is not only unnecessary and damaging to a well-respected business, it would also undermine public health.   Many of the products that would be subject to the recall are in a state of shortage nationwide and are used mostly in the operating room, emergency room, and in labor and delivery in order to deliver critical care and save lives.   The recall, and a subsequent breakdown in SCA's business, would exacerbate these shortages, disrupt ongoing courses of treatment, and ultimately force hospitals and healthcare facilities to prepare for themselves the injectable and/or infusible pharmaceuticals SCA currently produces with the benefit of state-of-the-art facilities and practices.    Hospitals and healthcare facilities, by contrast, are subject to much less stringent regulatory guidelines and have less expertise in assembling these dosages in a sterile environment than registered manufacturers like SCA.    The net result of FDA's actions, in sum, would be to compromise and disrupt ongoing courses of treatment, and to subject patients to pharmaceutical products that are less regulated and less safe.

19.     In this action, SCA is respectfully asking this Court to enjoin—beginning with a temporary restraining order designed to preserve the status quo—and declare unlawful the FDA's

unfounded public notice and any other such adverse action the FDA might take.   Otherwise, the FDA will be putting at risk a trusted source of high-quality, necessary medications and triggering false alarms and disruptions for hospitals and patients who are today relying upon specialized products from SCA.

## THE PARTIES

20.     Plaintiff SCA Pharmaceuticals, LLC is an Arkansas corporation in good standing, with its principal place of business in Little Rock, Arkansas.

21.     Defendant U.S. Food and Drug Administration is a major operating division of the U.S. Department of Health and Human Services ("HHS"), a cabinet-level agency of the Executive Branch of the United States Government.   The FDA is the agency of the United States Government that administers the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–397.   HHS and FDA are agencies within the meaning of the APA, 5 U.S.C. § 701(b)(1).

22.     Defendant Xavier Becerra is Secretary of Health and Human Services. Secretary Becerra is charged with administering the FDCA, including the adulteration provisions of 21 U.S.C. § 501.   As Secretary of HHS, Secretary Becerra has supervisory responsibility for the FDA.   Secretary Becerra has delegated his authority under the FDCA to the Commissioner of Food and Drugs.   Secretary Becerra is sued in his official capacity as Secretary of HHS.

23.     Defendant Dr. Robert M. Califf is Commissioner of Food and Drugs.   In that capacity, Dr. Califf has the authority and responsibility for administering FDA and the FDCA, including matters delegated by the Secretary of HHS relating to investigations as well as the statutes and regulations at issue in this case.   Dr. Califf is sued in his official capacity as Commissioner of the FDA.

24.     Defendants the FDA, Becerra, and Califf will be collectively referred to hereafter as "the FDA."

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant) & 2201 (injunctive relief).

26.     This Court has personal jurisdiction over the defendants.

27.     5 U.S.C. § 702 waives United States sovereign immunity for actions seeking declaratory and injunctive relief.

28.     Venue is proper in this District because the Defendants are officers of the federal government and a substantial part of the events giving rise to this claim occurred here, particularly at SCA's Windsor Facility.    28 U.S.C. § 1391(e)(1).

## FACTS

### A.     Drug Compounding

29.     "Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient.

30.     Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product."[4]

31.     Compounding is as old as the pharmaceutical industry itself.   Pharmacists are trained in compounding at pharmacy school and often perform compounding for individual patients at neighborhood retail pharmacies.   Compounding services can also be performed at pharmacy compounding facilities that are directed by licensed pharmacists.   These pharmacy

---

[4]   *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360–61 (2002).

facilities are able to compound more commonly requested variations of FDA-approved drugs and dispense compounded medications based on an individualized patient need.   They do not engage in the wholesale distribution of drugs or manufacture drug products at a commercial scale.

**B.    The Statutory Framework**

*Traditional Pharmacy Compounding*

32.    Historically, pharmacies and drugs have been regulated by the states as part of their regulation of health and medicine.    It was not until the turn of the century, with the passage of the Pure Food and Drug Act of 1906, that the Federal Government first became involved in regulating drugs.    In 1938, Congress replaced the Pure Food and Drug Act with the FDCA, 21 U.S.C. § 301 *et seq.*, to regulate drug manufacturing, marketing, and distribution.

33.    The FDCA did not upset the traditional regulatory structure for compounding, neither prohibiting traditional pharmacy compounding nor bringing it under the auspices of the federal regulation through the FDA.    "For approximately the first 50 years after the enactment of the FDCA, the FDA generally left regulation of compounding to the States.    Pharmacists continued to provide patients with compounded drugs without applying for FDA approval of those drugs."[5]

34.    By the 1990s, Congress and the FDA grew concerned that lines between drug manufacturers and compounders were blurring.    To draw clear lines, Congress enacted the Food and Drug Administration Modernization Act ("FDAMA"), which expressly exempted compounders of human products from the FDCA's requirements for "new drugs," while establishing criteria to distinguish traditional compounders (who would remain regulated by states)

---

[5] *Thompson*, 535 U.S. at 362.

from larger drug manufacturers then operating as compounders (who would be subject to the FDCA's new-drug requirements).

35.    Under the FDAMA, for example, to be exempt from FDA regulation, compounding must be performed by licensed pharmacists and cannot copy commercially available drugs.   21 U.S.C. § 353a(a), (b)(1)(D).

36.    In 2013, in response to safety concerns arising from the meningitis outbreak at the New England Compounding Center, Congress further amended the FDCA with respect to drug compounding in the Compounding Quality Act ("CQA"), 21 U.S.C. § 353 *et seq.*   Under these provisions—FDCA § 503A, 21 U.S.C. § 353a—qualifying compounders continue to be free to operate without the need to seek FDA approval for compounded drug products, and are subject to state-law regulations.   These compounders are termed "503A compounding pharmacies" or "503A pharmacies."   "These facilities," according to the FDA, "may be subject to less stringent quality standards set in state law or policy," and "[s]uch standards may differ state to state."[6]   The CQA also established "outsourcing facilities" subject to FDCA § 503A, 21 U.S.C. § 353a, or "503B manufacturers," that are "subject to increased quality standards" under federal law.[7]   503B manufacturers are inspected by FDA "according to a risk-based schedule."[8]

*Safety and Sanitation Standards*

37.    The USP is an independent, nonprofit organization that develops standards for making medications.   Although the USP is a non-governmental organization, Congress enshrined

---

[6]    U.S. FOOD & DRUG ADMIN., *Compounding and the FDA: Questions and Answers* (June 29, 2022), https://perma.cc/X2FK-T8FD.

[7]    *Id.*

[8]    *Id.*

the USP standards as the gold standard in 1938 in the FDCA.   Multiple provisions of federal law still incorporate USP standards as appropriate standards of conduct.

38.   The USP standards contain detailed guidelines for both nonsterile and sterile preparations of compounded drugs.   The standards, contained in USP chapters 795 and 797, address the proper sanitary conditions, sterilization protocols, and drug compounding procedures, and they generally represent current knowledge of the best pharmaceutical procedures.

39.   Each of the 50 states, as well as the District of Columbia, regulates compounding pharmacies and pharmaceutical manufacturers based on the USP standards.   Many states have directly adopted the USP standards as the state standards.   Other states substantially incorporate the USP standards with certain modifications.   As a result, 503A facilities are generally subject to the USP standards.

40.   Pursuant to the FDCA, the FDA has created a separate, heightened set of standards that apply to 503B pharmaceutical manufacturers: the "Current Good Manufacturing Practices" ("cGMP standards").   21 C.F.R. parts 210 and 211.   503B facilities are subject to these detailed cGMP standards, whereas 503A facilities are not.

41.   As a 503B facility, the Windsor Facility is held to established cGMP standards.

### Adulteration and Insanitary Conditions

42.   The FDCA prohibits "[t]he adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce."   21 U.S.C. § 331(b).   Section 351 defines drugs that are "deemed to be adulterated" to include those that are "prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health."   *Id.* § 351(a)(2)(A).

14

43.     In 2020, the FDA finalized its non-binding *Insanitary Conditions at Compounding Facilities* guidance ("Insanitary Conditions Guidance") to guide compounding facilities on the FDA's implementation of the adulteration and insanitary conditions provisions of the FDCA.   But the FDA's "guidance" is no more than a non-exhaustive list of "examples of insanitary conditions." No other guidance or regulation illuminates what standards determine whether the FDA will deem a manufacturer to be "insanitary" such that the FDA will deem the manufacturer's compounded drugs to be "adulterated."

44.     Congress instructed the FDA to use a specific set of procedures to enforce the provisions of the FDCA, including the adulteration and insanitary conditions provisions.   These procedures feature judicial remedies, like injunctions or seizures, 21 U.S.C. §§ 332, 334, and afford regulated entities the all-important opportunity to contest the FDA's findings in a court of law.

45.     Over the last several decades, Congress has given the FDA statutory authority to order mandatory recalls of food, *see* 21 U.S.C. § 350*l*, and certain medical devices, *see* 21 U.S.C. 360h(e)(1), but it has never granted the FDA the authority to order recalls of drugs.[9]

46.     Nevertheless, the FDA has gone to considerable lengths to circumvent judicial review of its actions and the limits that Congress has placed on its authority.   When the FDA declares a manufacturer's facility "insanitary," it often demands a "voluntary" recall and threatens to issue a public statement warning against using the manufacturer's products.[10]   The FDA claims its authority to issue such a public statement from Section 705(b) of the FDCA ("Section 705(b)

---

[9]     *See, e.g.*, Lars Noah, *Governance by the Backdoor: Administrative Law(lessness?) at the FDA*, 93 Neb. L. Rev. 89, 127 (2014)

[10]     *See, e.g.*, *id.* at 127-29;

Notice"), which states that "[t]he Secretary may . . . cause to be disseminated information regarding . . . drugs . . . in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer."   21 U.S.C. § 375(b).

47.    Because many pharmacies and pharmaceutical manufacturers are small businesses facing challenging market conditions, the FDA knows that a Section 705(b) Notice poses an existential threat such that a manufacturer has no choice but to comply with the "voluntary" recall demand.

48.    For instance, following investigation of AmEx Pharmacy, the FDA made such an ultimatum to recall all of the pharmacy's products intended to be sterile.   When AmEx balked at recalling every one of its products, the FDA, rather than initiate an enforcement action to prove its findings, issued a 705(b) Notice under the auspices of warning the public.   In the 705(b) Notice, FDA "warned" patients not to use any of the company's products, suggesting such use "may result in serious and potentially life-threatening infections or death," despite the fact that "FDA [was] not aware of any reports of illness associated with the use of AmEx Pharmacy's drugs":

### FDA warns patients and health care professionals not to use sterile products from Pacifico National Inc., dba AmEx Pharmacy

FDA is warning patients and health care professionals not to use products intended to be sterile produced by Pacifico National Inc., doing business as AmEx Pharmacy, Melbourne, Florida, due to a lack of sterility assurance. These drugs may pose a safety risk to patients.

Administration of a nonsterile drug intended to be sterile may result in serious and potentially life-threatening infections or death.

Health care professionals should immediately check their medical supplies, quarantine any drugs prepared by AmEx Pharmacy, and not administer or provide them to patients.   FDA urges health care professionals, who obtained products from AmEx Pharmacy, to make alternative arrangements to obtain medications from sources that adhere to proper quality standards. Patients who have received any drug produced by AmEx Pharmacy and have concerns should contact their health care professional.

16

FDA investigators recently inspected AmEx Pharmacy's facility in May 2019 and observed conditions that could cause AmEx Pharmacy's drugs to become contaminated or otherwise pose risks to patients.

On June 25, 2019, FDA recommended that AmEx Pharmacy voluntarily recall all unexpired drugs intended to be sterile and cease sterile operations until the company takes adequate corrective actions.   However, AmEx Pharmacy has not initiated the recall.[11]

49.    Just one month later, AmEx Pharmacy was forced to shut down.[12]

50.    In theory, the FDA has imposed regulations on itself that restrict its ability to demand a recall.   The FDA's regulations state that "[r]ecall is a voluntary procedure," and "recognize that recall is an alternative to a [FDA]-initiated court action" that would, of course, be subject to judicial review.   21 C.F.R. § 7.40(a).   According to the regulation, the FDA should not be pursuing a recall until it conducts a rigorous evaluation of the health hazard presented by a product being recalled (HHE), which evaluation must "take into account . . . the following factors":

(1) Whether any disease or injuries have already occurred from the use of the product.

(2) Whether any existing conditions could contribute to a clinical situation that could expose humans or animals to a health hazard. Any conclusion shall be supported as completely as possible by scientific documentation and/or statements that the conclusion is the opinion of the individual(s) making the health hazard determination.

(3) Assessment of hazard to various segments of the population, e.g., children, surgical patients, pets, livestock, etc., who are expected to be exposed to the product being considered, with particular attention paid to the hazard to those individuals who may be at greatest risk.

---

[11]    U.S. FOOD & DRUG ADMIN., *FDA warns patients and health care professionals not to use sterile products from Pacifico National Inc., dba AmEx Pharmacy* (June 28, 2019), https://perma.cc/MBX4-4F6U.

[12]    *Id.* ("AmEx Pharmacy has not been operational since July 27, 2019.").

(4) Assessment of the degree of seriousness of the health hazard to which the populations at risk would be exposed.

(5) Assessment of the likelihood of occurrence of the hazard.

(6) Assessment of the consequences (immediate or long-range) of occurrence of the hazard.

*Id.* § 7.41(a).   Based on this determination, the FDA must "assign the recall a classification, i.e., Class I, Class II, or Class III, to indicate the relative degree of health hazard of the product being recalled or considered for recall."   *Id.* § 7.41(b).

51.    The FDA's regulations empower it to request that a firm initiate a recall only when it has determined "[t]hat a product that has been distributed presents a risk of illness or injury or gross consumer deception," and "[t]hat an agency action is necessary to protect the public health and welfare."   *Id.* §§ 7.45(a)(1), (3).   Upon determining the propriety of the recall request, the FDA must "notify the firm of this determination and of the need to begin immediately a recall of the product," and this notification must be "by letter or telegram."   *Id.* § 7.45(b).   The FDA's notification must "specify the violation, the health hazard classification of the violative product, the recall strategy, and other appropriate instructions for conducting the recall."   *Id.*

52.    Despite all this, the FDA purports to be wholly unfettered in its use of the 705(b) Notices, which it may issue for any reason (or no reason), without ever making any external showing or answering to any external review.   By employing the above-described enforcement strategy, the FDA need never prove its findings, justify them to the relevant pharmacy (let alone a reviewing court), or even adhere to its own regulatory guidelines.   Instead, the FDA "requests" that any target pharmacy "voluntarily recall" all of its non-expired products, thereby incurring crushing expenses, burdens, and stigmas, lest the target pharmacy immediately suffer FDA's wrath in the form of a 705(b) Notice that effectively ends the pharmacy's existence.   By developing and

employing this strategy in case after case, the FDA is regulating via *ipse dixit* and steamrolling reputable pharmacies and pharmaceutical manufacturers while evading judicial review.

      C.     **SCA's Windsor Facility Is A 503B Manufacturer**

     53.     SCA is an FDA-registered Section 503B Outsourcing Facility subject to FDA's heightened Current Good Manufacturing Practices (cGMP) regulations.   SCA's Windsor Facility has been in operation for six years, and its Little Rock Facility has been in operation for twelve years; it started in 2011, which was two years before 503B was even enacted by FDA. Collectively, across both facilities, SCA produces and distributes approximately 7 million units of pharmaceutical products every year.   SCA counts among its clients some of the leading hospitals and healthcare facilities in the nation, including the hospital systems for the University of California San Francisco, Stanford University, Kaiser Permanente, New York University, Memorial Sloan Kettering, Pennsylvania State University, and Northwell Health.

     54.     SCA's Windsor Facility purchases sterile, FDA-approved medications from leading pharmaceutical manufacturers (*e.g.*, Pfizer, Par Pharmaceuticals, and so on) combines, mixes, adds-to, and/or dilutes them into ready-to-administer dosages (frequently smaller package sizes than those in which they started) in a sterile environment, using sterile processes, and distributes those final products (injectable and/or infusible pharmaceuticals) to hospital customers for use emergency rooms, operating rooms, and labor and delivery facilities nationwide.   These products are primarily used for life-saving, life-sustaining products used for critical hospital services, including pain management, anti-infectives, cardiovascular, anesthesia, OB/GYN, and renal disease.   The sterile drug products are packaged into syringes, IV bags, and Computerized Ambulatory Delivery Device cassettes.   Many of the ready-made injectable and infusible pharmaceuticals that SCA produces are in short supply nationwide and on the FDA's "shortage

list."   Among the injectable pharmaceuticals that are produced by SCA and presently on the shortage list are Fentanyl citrate, Rocuronium bromide, Ketamine hydrochloride, Lidocaine hydrochloride, Hydromorphone hydrochloride, Diltiazem hydrochloride, Epinephrine hydrochloride, Potassium chloride, Morphine sulfate, Midazolam hydrochloride, and Atropine sulfate.

55.     Given these shortages, absent SCA's production, the hospitals and healthcare facilities that rely on SCA's products, many of which are subject to nationwide shortages, would have to produce these ready-made injectable pharmaceuticals themselves at in-house 503A hospital pharmacies, or even at patients' bedsides, which are not subject to cGMP standards.

56.     SCA is licensed in 49 states (every state except North Dakota) and Washington, D.C.   It operates in compliance with the applicable laws of these states and district, Section 503B of the Federal Food, Drug and Cosmetic Act, and all applicable federal statutory and regulatory requirements.   It undergoes routine in-person inspections by the U.S. Drug Enforcement Administration and multiple state boards of pharmacies, including the California, Virginia, and Michigan Boards of Pharmacy.

57.     The Windsor Facility was inspected by the FDA in 2019, and the FDA issued a close-out letter in 2021 concluding that all issues that had arisen during the 2019 inspection had been resolved.   The FDA also inspected the Little Rock Facility in 2019, SCA promptly resolved all issues found, and the FDA closed out its inspection in 2021.

58.     SCA has not rested on its laurels since these successful inspections.   It has continued to invest in and strengthen the compliance procedures in both its Windsor and Little Rock Facilities.

59.     From May 2 through 17, 2023, the FDA inspected the Little Rock Facility again, during which time it spent a total of 10 days on-site reviewing and observing protocols and practices paralleling those at the Windsor Facility, and issued a 483 containing four minor observations, which SCA promptly responded to and rectified without adverse incident.   The FDA closed out this investigation via FMD-145 Release of the Establishment Inspect Report only 90 days later, a very fast timeline.

60.     Given that the FDA inspects 503B manufacturers "according to a risk-based schedule,"[13] this lag-time almost certainly reflects a judgment that SCA's facilities, which process exclusively sterile products purchased from other leading manufacturers, are at low risk of significant contamination issues.

**E.      FDA's Inspection of SCA's Windsor Facility**

61.     From September 18 through October 20, 2023, over fifteen business days, the FDA initiated and conducted a sweeping inspection of SCA's Windsor Facility.   The inspection included multiple wide-ranging tours of the facilities, discussions with key departments in the facility, observations of various operational processes and activities, including cleanroom manufacturing, review of SCA internal data and documents, and extensive discussions regarding the safety techniques that SCA employs in the facility.

62.     SCA fully cooperated with the FDA's inspection and afforded the FDA unfettered access to its facilities.

63.     The FDA is empowered during these investigations to take samples of products, as well as environmental and personnel samples, to test for contamination, and often does so,

---

[13]     *Compounding and the FDA: Questions and Answers*, U.S. FOOD & DRUG ADMIN. (June 29, 2022), https://perma.cc/X2FK-T8FD.

21

especially when there is any concern that a product may be compromised or pose risks for patients. The FDA, however, *declined* to take *any* samples from SCA's Windsor Facility.

64.     The FDA inspectors spoke extensively with SCA employees throughout this process regarding their observations and the procedures that SCA had in place.   The FDA inspectors' comments were overwhelmingly positive and complimentary regarding SCA's patient compliance efforts.   Inspectors, for example, specifically praised SCA's environmental monitoring program for contamination control in its facilities, stating on the third and fifth day on site that they could tell that SCA "spent a lot of time developing [its] [environmental monitoring] program."

65.     On October 13, the FDA officials provided an overview of the observations they would provide on their forthcoming Form 483.[14]   The officials reiterated that it was "great to work with" SCA, and let them know that all 483s are "written in a way that never read well," but that SCA should "not" take the tone of the 483 as "indicative of [the officials'] experience with" SCA.

## F.     The Inspectors' Observations

66.     On October 20, 2023, the FDA concluded its inspection and issued a Form 483 listing ten observations regarding the Windsor Facility.   A true and correct copy of the 483 is attached hereto as Exhibit A.

67.     At no point during the month-long inspection process did the FDA's inspectors even purportedly observe that any product released to the public was potentially adulterated in any way.

---

[14]  A 483 is the report issued to management after an FDA inspection that lists observations of conditions of the facility.    These "observations" identify potential areas of noncompliance.

And SCA is not aware of any product complaints or adverse events related to particulate matter associated with the products produced by the Windsor Facility.

68.     The FDA's ten observations pertained to minor, redressable, and isolated incidents. They do not demonstrate insanitary conditions that justify total recall of drugs from a compounding facility.    And, apart from a few technical violations that the FDA does not contend pose a risk to health or human safety, the FDA on the 483 has not identified any regulations or statutes that SCA had violated.    This is noteworthy because 483s usually and properly include such specifications.

69.     The first two observations, for example, criticize the process that SCA's "quality control unit" put into place during the "visual inspection" phase of SCA's safety review.    The visual inspection phase is the last step in the redundant measures that SCA employs to find potentially tainted products.    After products have passed close inspections using lab techniques, the products are visually inspected by individuals who discard *every* product that appears potentially flawed in any way, whether the defect is trivial (*e.g.*, smeared ink on a syringe) or critical (*e.g.*, liquid leaking from a syringe).    They also classify the defects of products they discard.    Notably, SCA employs the *same* quality control procedures for visual inspection in its *Windsor Facility* as it employs in the *Little Rock Facility* that the FDA recently inspected and effectively endorsed via prompt close out just a short few months later.

70.     Despite giving SCA's quality control procedures a positive close-out letter on the visual-inspection process in Little Rock just six months ago, the FDA faulted those same procedures this time, in Windsor.    At the same time, the FDA did not find that SCA had ever released a defective product.    Rather, it criticized SCA for failing to "identif[y] [the] particulates found during the investigation process," not "opening [] an investigation" every time a product

fails a visual inspection in any way, and not calculating the percentage of products that are removed from every batch (that is, the "yield").

71.     Federal regulations, however, do not require such identifications, investigations, or yield calculations.     A 2021 FDA "Draft Guidance," which, the FDA states in a header atop every page, "***Contains Nonbinding Recommendations***," *recommends* "particulate identification" and "investigation" as part of the visual inspection process, but does not *require* it.[15]     In other words, the FDA appears to have used those first two observations to impose on SCA guidance that is not legally binding, has not gone through notice and comment, and does not come close to notifying regulated entities that they *must* adopt FDA's recommendation, on pain of death.

72.     This is not the first time the FDA has tried to overstep its statutory authority.     In 2016, a House Appropriations Committee Report highlighted that the FDA was subjecting compounding facilities to an improperly high standard of compliance:

> The Committee understands that the FDA is interpreting provisions of Section 503A of the FDCA to inspect state-licensed compounding pharmacies under current Good Manufacturing Practices (cGMPs) instead of under the standards contained in the United States Pharmacopeial Convention (USP) . . . . The Committee reminds the FDA that compounding pharmacies are not drug manufacturers, but rather, are state licensed and regulated health care providers that are inspected by state boards of pharmacy pursuant to state laws and regulations . . . . Compounding pharmacies are more appropriately inspected using USP standards or other pharmacy inspection standards adopted by state law or regulation in the state in which a pharmacy is licensed.[16]

---

[15]     U.S. Food & Drug Admin., *Inspection of Injectable Products for Visible Particulates Guidance for Industry*, at 1, (Dec. 2021), https://www.fda.gov/media/154868/download.
[16]   H.Rept. 114-531, at 69.

73.     The FDA is doing the same thing again, albeit now in the 503B context.    But the APA does not permit an agency to disregard the statutory and other limitations that are part and parcel of the rule of law.

74.     Observations three through seven of the 483 relate to the procedures in place in SCA's "clean room" where trained SCA employees compound products starting with FDA-approved sterile products they purchase from leading pharmaceutical manufacturers.

75.     Observation three, for example, concerns the Chemistry lab's subvisual particle matter test that SCA performs on all its finished products consistent with federal regulations.    It initially performs a "Test Method 1 (Light Obscuration Particle Count Test)" and, if a sample fails that test, performs a more exacting "Test Method 2 (Microscopic Particle Count Test)."    The difference between these two tests is akin to that between an X-ray and a CT scan: the former provides high-level notifications of a potential issue, but the latter allows someone to zero in and determine whether the purported anomaly is actually a problem or not.    UPS 788, which sets standards for testing particulate matter in injections, endorses this method: "it may be necessary to test some preparations by the Light Obscuration Particle Count Test followed by the Microscopic Particle Count Test to reach a conclusion on conformance to the requirements."    It also states, for Test Method 1: "If the average number of particles exceeds the limits, test the preparation by the Microscopic Particle Count Test (TM2)."    The FDA is now criticizing SCA for a "failure to thoroughly review any unexplained discrepancy" between Test Methods 1 and 2 if a product fails the former and passes the latter.    Yet no such review is required by regulation, nor is it clear what sort of review the observation contemplates.    Moreover, the FDA also acknowledges that there have been *only 38* batches of products where there has been such a discrepancy *in the last four years*, during which time, the Windsor Facility has released *tens of thousands* of batches.

25

76.    Another portion of observation three concerns failures in a sterility testing method that SCA employs (BioMerieux ScanRDI) that had out-of-specification results 29 times since 2019.   Every time this test returned such results, SCA "rejected" every single unit in the impacted batch, yet the FDA faulted SCA for failing to investigate the cause of each failure.    This concern will soon be moot, however, because SCA has already begun migrating from the ScanRDI sterility test to a more advanced "Celsis Method" for sterility testing.   The Little Rock Facility also employed the same ScanRDI sterility tests that the FDA criticized in its Windsor Facility 483, yet the FDA had no observations of concern about these tests in its May 2023 Little Rock inspection.

77.    A final part of observation three notes that there had been "incidences of foreign materials found in syringe tray packs," such as "cardboard and hair," and, while SCA "rejects" any "product found to be associated with tray packs in which foreign material was identified," it did not "track or trend operators who identify[] foreign materials."   That ancillary concern about tracking SCA's human "operators" is well removed from the "foreign materials" that have been systematically "identif[ied]" and removed by SCA without any alleged failure.

78.    Observation three, in short, does not concern any issues relating to patient safety, just failures to further investigate—through still more layers of prophylaxis and protocols—every conceivable anomaly that might arise.

79.    Observation four concerns the failure to set "[w]ritten procedures" "to ensure consistency and adequacy of cleaning," including failure to ensure that the cleaning product is used in the same quantity on each bin carrying products (or "totes"), and failure to ensure that the cleaning product is applied for five minutes exactly.   SCA has no issue with adhering to these requirements and has committed to memorializing and following FDA's proposals before it

commences production.    But these procedures do not implicate SCA's ability to catch visual or microscopic defects or contaminations in its products.

80.    Observation five concerned a few technical failures to abide by all written standard operating procedures while the FDA was present, including one instance in which an "aseptic Assistant [] was observed to touch items" that were not sterile and then "reach[] into" a lab hood "to provide additional starting materials and retrieve finished product" without changing gloves. These errors are, of course regrettable, but the FDA observed only three such minor instances over its month-long inspection, and do not come close to suggesting that all products—or frankly any products—ever produced by the Windsor Facility products are tainted.

81.    Observation six criticizes SCA's environmental monitoring program for failing to test Aseptic Assistants' gloved fingertips or sleeves, and similar minor discrepancies, in its sterility auditing procedures.    But this is the same environmental monitoring program that FDA investigators praised as having had "a lot of" time put into it, without raising any bottom-line concerns about product safety.

82.    Observation seven cites scratches that appear on the plastic totes that SCA uses to transport materials and finished pharmaceutical products, as well as an internal SCA assessment that found contamination in 3% of its totes that SCA self-identified and is working to resolve. But any perceived problems with potential contamination in the totes are resolved by the other layers of contamination testing, described in part above, which are designed to weed out and catch any actual threat to pharmaceutical products.

83.    Observations eight through ten concern paperwork failures.    Observation eight describes two investigations into potential product issues reported by customers over the last several years that were closed, based on SCA being unable to "confirm[]" the accuracy of the

complaints, without SCA first "test[ing]" the returned products that were the subject of the complaints.   Observation nine describes the lack of purportedly appropriate controls "exercised over computers to assure that changes in master production and control records . . . are instituted only by authorized personnel."   And observation ten states that "some . . . drug product labels did not include the complete established name of the drug product," and specifically lacked "the name of the salt (e.g., citrate, bitartrate, and hydrochloride) in addition to the base on the label."

84.    Of these observations, the FDA tied only observations nine and ten—which no one can misperceive as implicating product safety, and which FDA has not raised in its facility closure and recall discussions—to actual violations of present regulatory requirements.

### G.    The FDA Issues An Ultimatum to SCA

85.    The 483 Form itself carries no sanction and, according to the form itself, does "not represent a final Agency determination regarding [a company's] compliance."   Rather, the observations are just that: "inspectional observations" that are meant to commence an iterative process.   And again, the FDA inspectors assured SCA on their final day of inspections that 483s "never read well" and that the 483's tone was not "indicative of their experience" with SCA's actual practices and procedures.

86.    The FDA's website states that "firms are encouraged to respond to the FDA Form 483 in writing with their corrective action with supporting documentation within 15 business days from the issuance of the FDA."[17]   This allows the entities to provide additional context, corrections of FDA errors, or an explanation of remedial actions taken in response to FDA findings. The FDA's own 2023 Investigations Operations Manual allows (at § 5.11.4.3.15) companies to

---

[17]    U.S. FOOD & DRUG ADMIN., *What to Expect after an Inspection: 483s, Responses and Beyond* (Dec. 14, 2022), https://perma.cc/76W7-BV5J.

submit "an adequate response to the FDA-483 . . . within 15 business days."[18]   Nevertheless, the FDA without prior notice (and contrary to the expressly-specified timetable) short-circuited its guaranteed process, issued an ultimatum, and demanded a response to that ultimatum, a week before that 483 response deadline expired.

87.     Specifically, on the afternoon of October 31 (Halloween), or 11 calendar days after the 483 was issued, the FDA contacted SCA by email to request "a meeting" within "the next two days."   The email stated that the call was not meant "to discuss the FDA 483" but rather was intended to "discuss the firm's plan for product on the US market."

88.     SCA's leadership had a call with FDA officials, within two days as directed, at 10:00 a.m. ET on November 2, last Thursday.

89.     At the meeting, FDA officials (not the original investigators who issued the 483 observations) stated that they recommended immediate cessation of production and distribution based on concerns flagged within the 483, despite the FDA's earlier statement by email that the purpose of the call was *not* to discuss the 483.

90.     The "most objectionable" concerns flagged in the 483, according to the FDA, were observations one through three (the failure to investigate visual inspection failures or divergences between Test Methods 1 and 2).    The FDA did not raise observations eight, nine, or ten as grounds for concern.

91.     At the end of its recitation of the relevant 483 observations, the FDA stated that it was recommending that SCA's Windsor Facility initiate a recall of all sterile drug products that

_____

[18]     https://perma.cc/R4KV-LM2B.

had not yet expired, cease production until it had taken adequate corrective actions, and notify the FDA before SCA recommended sterile drug production.

92.     SCA assured the FDA that these issues were its top "priority," that "safety" was its "number one concern," and that it needed more time to assess the risk of products in the market before it could commit to a recall.

93.     The call lasted only 17 minutes in total.

94.     The FDA immediately followed up by email at 10:39 a.m. on November 2, repeating its request for a voluntary recall of all SCA products and immediate cessation of production.    A true and correct copy of the parties' email exchanges is attached hereto as Exhibit B.   After reciting the issues contained in the 483, the FDA stated that "the observations made" in the 483 "have resulted in the following violations: 21 U.S.C. § "501(a)(2)(A): Because drugs were prepared, packed, or held under insanitary conditions whereby they may have been contaminated with filth, or whereby they may have been rendered injurious to health," and 21 U.S.C. § "501(a)(2)(B): Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP."    The FDA did not, however, specify the health hazard classification of the violative product, as its own regulations require.    21 C.F.R. § 7.45(b). The SCA demanded "**a response within 24 hours**" to its purported request for an all-encompassing recall (emphasis in original).

95.     At 10:30 a.m. on Friday, November 3, within the 24-hour deadline, SCA responded by email, "confirm[ing] that" it had "stopped all production and distribution from" its Windsor Facility, and that "[p]roduction will not resume until we have made every effort to address the issues you have raised verbally and via the Form 483."    SCA, however, required an additional "1.5 business days (until Monday 11/6)" to "make an informed decision" as to whether it would

implement the "broader recall of all unexpired products," and requested that the FDA share its HHE "that informs its perspective" regarding the supposed need for a recall.

96.     At 5:11 p.m. that same day, the FDA responded that they "do not concur with" SCA's course of action.   FDA "acknowledge[d] [the] decision to cease[] operations" but "continue[d] to recommend" an immediate and total recall, and requested a final decision on that front by close of business today—Monday, November 6.

97.     The FDA is telegraphing to SCA that FDA has resolved to issue a Section 705(b) Notice warning against any continued use of the Windsor Facility's products, just as the FDA has repeatedly done in other such cases, unless SCA "voluntarily" proceeds with the total recall of all products precisely as the FDA has requested.    Indeed, in its Friday evening email, the FDA asked SCA to "provide a list of all drugs that are currently on the market with date of production, date of release, number of units released for distribution, number of units still waiting for distribution, BUD, Lot Number, and drug name."   The apparent purpose of this demand is so that the FDA can issue its Section 705(b) Notice calling out those drugs.

98.     In demanding a recall and threatening a Section 705(b) Notice, the FDA is pretermitting any response to the 483—which SCA should have additional time to respond to, according to the FDA's own specified timetable—and is refusing to engage meaningfully or answer basic questions about the scope and premises of any such expanded recall.    The FDA well knows that it has the power to destroy a business by just initiating an investigation and issuing a damaging public warning without ever having to prove anything in court.

### H.     FDA's Decision Will Cripple SCA's Business And Harm Public Health

99.     The looming, existential threat that SCA faces defies quantification.

100.   A total recall of SCA's products from its Windsor Facility would impose staggering costs on SCA and tip it into bankruptcy.   The immediate cost of the recall would require SCA to buy back 2.5 million doses from 1,200 hospitals across the country and reimburse its customers more than $36.5 million.   SCA would also have to dispose of approximately $9 million in other raw materials at its facilities, bringing the total cost of the recall to $45.5 million immediately. The true cost, however, would be far greater, as SCA's supply contracts would also require it to pay for its customers to secure replacement products for all the products it recalled.   It would be virtually impossible to sustain financially even SCA's smaller Little Rock Facility.   These costs collectively would be unaffordable and inevitably tip SCA into bankruptcy, and SCA would have to immediately lay off hundreds of its employees the moment the recall went into effect.

101.   The other path that the FDA has waiting for SCA is no less fatal for SCA.   A Section 705(b) Notice claiming that all of SCA's products from its Windsor Facility pose an imminent danger and should not be used by anyone would destroy SCA.   Such a statement on federal agency letterhead, no matter how unwarranted or defective, will threaten to eviscerate public confidence in SCA's products and reputation and to deter patients and providers.   The FDA's threatened Section 705(b) Notice will cause SCA to suffer irreparable harm in the form of loss of reputation, loss of trade, loss of goodwill, and even loss of its existence.   And it would immediately cause countless customers to stop using SCA products out of precaution, as any hospital would feel pressure, consistent with its ethical obligations and concerns regarding legal liability, to eschew pharmaceutical products from a facility that the FDA has denounced as unsafe, no matter how arbitrary or unfounded the FDA's warning is.

102.   SCA's monetary damages, even if quantifiable, will nonetheless be irreparable in the face of the FDA's sovereign immunity.

103.    By destroying SCA, the FDA will be hurting public health.    A significant portion of the drugs from the Windsor Facility that would be subject to the recall are on the FDA's shortage list and are desperately needed in emergency rooms, operating rooms, and for labor and delivery. Shutting down SCA via the recall or the Section 705(b) Notice would deprive many patients of the drugs they need.    And hospitals would inevitably try to replace the drugs lost through the recall (and future production when SCA is wiped out) by compounding the products themselves bedside or in 503A pharmaceutical hospitals that are subject to fewer regulations and lower safety standards than SCA.

**CLAIMS**

**COUNT I**
**Violation of the Administrative Procedures Act, 5 U.S.C. § 706(a)**
**(Arbitrary and Capricious for Lack of Explanation)**

104.    SCA incorporates herein by reference the preceding paragraphs 1–103 of this Complaint as if fully set forth in this paragraph.

105.    The FDA's imminent Section 705(b) Notice is a final agency action.

106.    The FDA has affirmatively and definitively stated it has found SCA to have insanitary conditions.    The imminent public announcement is set to be issued pursuant to FDA's definitive judgment that the drugs at issue present an imminent danger to health.

107.    The FDA's imminent Section 705(b) Notice will have an immediate impact on SCA's day-to-day operations.    The FDA's warning to SCA's customers and patients to stop using SCA products will have concrete, devastating effects on SCA's business, reputation, and goodwill.

108.    SCA has no further obligation to exhaust administrative remedies.    The FDA will not afford SCA a further opportunity to discuss or seek recourse from the FDA's decision within the agency itself.    To the contrary, the FDA has demanded complete, unconditional acquiescence by SCA.

109.    The FDA has provided no explanation of the standards that it applied to conclude that its 483 observations of SCA's Windsor Facility amount to insanitary conditions under the FDCA.

110.    The FDA has provided no explanation of its conclusion that SCA's products pose an imminent danger to the health of the consumer or violate cGMPs.

111.    The FDA has provided no explanation of the standards that it applied to conclude that all of SCA's Windsor Facility products within expiry should be recalled, rather than a targeted set of products.

112.    The FDA has no evidence that any of SCA's products were adulterated due to insanitary conditions.

113.    The FDA has not given any consideration to the obvious risk that its Section 705(b) Notice would itself pose an imminent danger to ongoing public health and patients who rely on SCA's products.   The Section 705(b) Notice will immediately remove from circulation safe drugs that are in shortage nationwide, depriving patients of the drugs they need, and forcing them to rely on hospitals and healthcare facilities to provide the same services SCA provided, albeit in a much less regulated, much more dangerous environment.

114.    The FDA's decision to find that SCA had insanitary conditions and its imminent Section § 705(b) Notice are bereft of any reasonable explanation of the specific analysis and evidence upon which the FDA is relying.   The FDA's statements and explanation reveal no rational connection between the facts found and the choice made by the agency.

115.    The FDA has also deprived SCA of any opportunity to respond to the purported violations within the 15-business day deadline.   The FDA's rush to judgment is entirely arbitrary and capricious, given that (1) the FDA has been aware of, and had no issues with, many of the

purported quality control issues since its inspection of the Little Rock Facility in May 2023; (2) the FDA raised no concerns during its fifteen-day on-site inspection; (3) the FDA did not demand the closure and recall based on the 483 observations for 13 days after issuing the 483; (4) the FDA denied SCA the HHE that would be the predicate for its recall demand; and (5) FDA's actions violate the FDA's own regulations and procedures.

**COUNT II**
**Violation of the Administrative Procedures Act, 5 U.S.C. § 706(a)**
**(Contrary to Law & Arbitrary and Capricious in Substance)**

116.    SCA incorporates herein by reference the preceding paragraphs 1–115 of this Complaint as if fully set forth in this paragraph.

117.    By all indications, the FDA's recall demand relies on unspecified, anomalous, and heightened standards that are foreign to the governing legal standards.    To make matters worse, the FDA is purporting to treat legal guidance that it has described as "non-binding" as not only binding but also enforceable via 705(b) Notice, amounting to a corporate death penalty.

118.    The FDA's improper application of made-up standards is clear on the face of the 483.    A number of its observations, and every single observation it cited en route to demanding the recall and closure, cite conduct or conditions at SCA that do not violate federal statutes or regulations.    Indeed, the Form 483 does not even attempt to trace the cited standards by which SCA is being judged to any established source—in statute, regulation, or otherwise.

119.    As such, the only explanation available from the FDA contravenes statutory prescription from Congress combined with the agency's own avowed position that its relevant guidance is "*non*-binding."    To proceed in such fashion is the height of arbitrariness and caprice, and it contravenes governing law.

## COUNT III
**Due Process**

120.    SCA incorporates herein by reference the preceding paragraphs 1–119 of this Complaint as if fully set forth in this paragraph.

121.    The Fifth Amendment's Due Process Clause requires that a regulated entity be afforded due process before it can be deprived of life, liberty, or property.   This entails, *e.g.*, notice that is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action, along with an opportunity at least to present their objections and have them heard.

122.    Courts have long recognized that a government pronouncement that stamps a citizen or company with a badge of infamy and destroys its reputation deprives a person of its liberty interest under the Due Process Clause, thus requiring meaningful notice and the opportunity to present one's objections and be heard.

123.    The FDA's imminent Section 705(b) Notice will inflict a deprivation under this precedent, particularly given that it would predictably extinguish or at least cripple SCA's entire business.

124.    The FDA has deprived SCA of constitutionally requisite notice and opportunity to present its objections.   Despite taking a month to investigate the Windsor Facility and two weeks after its 483 notice before presenting its recall and shutdown ultimatum, the FDA first demanded a recall within 24 hours and later extended the timeline to two business days total.   At no time has SCA been able to respond substantively and ventilate its objections.   Indeed, the FDA is not even affording SCA the *15 days* that the FDA *told* SCA would be available for responding to the *underlying 483*.   Such an approach of "sentence first, verdict afterwards" belongs in Alice in Wonderland; it has no place in the United States and is antithetical to due process.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SCA respectfully prays for judgment and relief against Defendants as follows:

1.      An order enjoining the FDA from printing or publishing any press release, 705(b) Notice, or statement regarding its investigation of SCA;

2.      A declaratory judgment that the FDA's adverse action against SCA is unfounded and unlawful;

3.      Any other relief the Court deems just and appropriate.

Dated:   November 6, 2023                    Respectfully submitted,

                                             */s/ Jeffrey P. Mueller*
                                             Jeffrey P. Mueller (ct27870)
                                             DAY PITNEY LLP
                                             Goodwin Square, 225 Asylum St,
                                             Hartford, CT 06103
                                             Phone: (860) 275-0100
                                             Fax: (860) 275-0343
                                             Email: jmueller@daypitney.com

                                             Derek L. Shaffer[*]
                                             QUINN EMANUEL URQUHART &
                                                  SULLIVAN, LLP
                                             1300 I Street NW, Suite 900
                                             Washington, DC 20005
                                             Phone: (202) 538-8000
                                             Fax: (202) 538-8100
                                             Email: derekshaffer@quinnemanuel.com

                                             Alex H. Loomis[*]
                                             QUINN EMANUEL URQUHART &
                                                  SULLIVAN, LLP
                                             111 Huntington Ave, Suite 520
                                             Boston, MA 02199
                                             Phone: (617) 712-7100
                                             Fax: (617) 712-7200
                                             Email: alexloomis@quinnemanuel.com

                                             *Attorneys for Plaintiff*
                                             *SCA Pharmaceuticals LLC*

---

[*] *Pro hac vice* application forthcoming.

## VERIFICATION OF COMPLAINT

I, Michael Magee, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I am the Senior Vice President for Quality of SCA Pharmaceuticals, LLC.   As such, I have full authority to verify the foregoing Verified Complaint on behalf of SCA.

I have read the foregoing Verified Complaint and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 6, 2023
in Windsor, Connecticut.

Michael Magee
Senior Vice President for Quality
*SCA Pharmaceuticals, LLC*