# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

**SCA PHARMACEUTICALS, LLC,**

            Plaintiff,

    v.

**U.S. FOOD AND DRUG
ADMINISTRATION**, **XAVIER BECERRA**,
in his official capacity as Secretary of Health
and Human Services, **DR. ROBERT M.
CALIFF**, in his official capacity as
Commissioner of Food and Drugs,

            Defendants.

Civil Action No. 3:23-cv-01462-SRU

**VERIFIED AMENDED COMPLAINT**

Jeffrey P. Mueller (ct27870)
**DAY PITNEY LLP**
Goodwin Square, 225 Asylum St,
Hartford, CT 06103
(860) 275-0100

OF COUNSEL:
Derek L. Shaffer (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

Alex H. Loomis (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100

*Attorneys for Plaintiff, SCA Pharmaceuticals, LLC.*

Plaintiff SCA Pharmaceuticals, LLC ("SCA") alleges as follows:

## NATURE OF ACTION

1.     SCA is a leading pharmaceutical compounder that delivers the highest-quality sterile injectable and/or infusible pharmaceuticals in ready-to-administer dosages for use at hospitals and healthcare facilities nationwide.   SCA prides itself on being the most customer- and patient-focused registered Section 503B compounding facility in the industry.

2.     SCA operates two state-of-the-art compounding facilities that meet and exceed United States Food and Drug Administration ("FDA") current good manufacturing standards. SCA's main facility, in Windsor, Connecticut (the "Windsor Facility"), boasts more than 90,000 square feet of sterile compounding laboratory, manufacturing, and warehousing space.   The Windsor Facility employs just under 400 people in the greater Hartford area.   SCA's second facility is a 17,000-square-foot sterile compounding facility located near SCA's Little Rock, Arkansas headquarters ("Little Rock Facility").   SCA employs about 145 people in the Little Rock Facility, as well as a team of sales representatives around the country.

3.     SCA has been widely praised for its contributions to Connecticut.   Governor Daniel P. Malloy, in 2017, lauded SCA for opening the Windsor Facility, stating he was "thrilled that this company is adding hundreds of good, high-quality jobs in our state."[1]   SCA's presence, Lieutenant Governor Nancy Wyman stated, "further establish[es] Connecticut as a global competitor in bioscience and healthcare."[2]

---

[1]     Press Release, *Gov. Malloy Announces Pharmaceutical Company Opening Manufacturing Facility in Windsor That Will Create 361 New Jobs*, CT.GOV (May 9, 2017), https://perma.cc/8N8E-XKGJ.

[2]     *Id.*

4.      But SCA's ability to continue operating as a business now faces an imminent, existential threat from a federal agency that is acting without warrant, without standards, without explanation, and without answering to judicial review.   Worst of all, the FDA has been systematically retaliating against SCA for exercising its First Amendment right to petition this Court to redress SCA's grievances.   As the Court observed in light of SCA's initial allegations, the flavor of the FDA's actions in this case "literally is the flavor of an agency blackmailing a company into complying with a recall that the agency cannot statutorily order."   ECF 60 at 11:3-8.   Absent judicial intervention, the FDA would, in the Court's words, be "free to do whatever they can do to pressure a company into taking actions that the FDA cannot require them to take under the statute, and that will never be reviewed."   *Id.* at 20:13-18.

5.      After ordering SCA effectively to shut down its Windsor Facility, the FDA leaned heavily on SCA to go even further by recalling tens-of millions-of-dollars-worth of product distributed from there, despite finding no deviations from regulatory guidelines or any insanitary conditions likely to taint products coming from that facility.   That would cripple SCA's business. If SCA fails immediately to acquiesce, however, then the FDA will subject SCA to scathing public condemnation via a statutory notification that explicitly directs customers and patients to refrain from using any of SCA's medications.   That, too, would amount to a death sentence for SCA.

6.      No such result is consonant with fairness or public health.   Were the agency permitted to orchestrate its Catch-22 with SCA, it would destroy SCA's business and force SCA into bankruptcy and send a chilling warning to any other pharmacy that might ever question the FDA or stand up to it in court.   Moreover, SCA's customers would lose access to medications subject to nationwide shortages, hospitals would be forced to make up for the shortages by compounding medicines themselves in less sterile and less regulated environments (including at

patients' bedsides, which, of course, lack sufficient sterility protections), and hundreds of employees will be denied continuing employment.

7.    For a four-week period from September and October of 2023, the FDA sent a team to inspect SCA's Windsor Facility.   Throughout their month-long investigation, the FDA officials raised no critical safety concerns while they were on-site.   To the contrary, they repeatedly commented to SCA employees that they could tell that SCA "spent a lot of time developing [its] program" for environmental monitoring and that any adverse technical observations that might later appear in the FDA's report would "not be indicative of" of the inspectors' positive experience at SCA.

8.    On October 20, 2023, the inspectors issued a "483" report containing ten negative observations, each of which related to alleged technical issues at the facility.   Among other things, the inspectors claimed that computer controls "to assure that changes in master production and control records" could be accessed by non-authorized personnel and that SCA, while discarding products that had technical minor defects, did not further investigate every single defect spotted in every single product.

9.    The inspectors' observations did not identify any problem that inspectors observed for any actual medication produced by SCA and certainly did not suggest that anyone was harmed by SCA's medications.   Rather, the 483 report faulted SCA for failing to ensure that its quality control *investigation* practices met *non-binding* FDA guidance.   Notably, the FDA found *no issues* with these *same practices* when it conducted a 10-day on-site inspection of SCA's Little Rock Facility in May 2023 and issued *that* facility a positive close-out letter.   The inspectors also faulted SCA for minor, isolated, and easily redressable observations relating to certain individual employees who had, in isolated instances, been acting in contravention of SCA standard operating

4

procedures.    Apart from alleging minor, technical defects in three drug labels and documentation

practices, which the FDA officials had previously assured SCA did not pose "major issues" (and

right now do not cite as grounds for demanding the recall), the 483 did not cite a single violation

of statute, regulation, or best practices.

10.    A 483 carries no sanction and, according to the form itself, "lists" only

"inspectional observations" made "by the FDA representative(s) during the inspection of your

facility" and "do not represent a final Agency determination regarding [a company's] compliance."

Instead, it is meant to begin an iterative process.    FDA protections are expansive, redundant, and

extraordinarily difficult (if not impossible) for any inspected facility to implement perfectly 100%

of the time throughout a multi-week period (as was spanned by the FDA's inspection of the

Windsor Facility).    The FDA's own website states that "firms are encouraged to respond to the

FDA Form 483 in writing with their corrective action with supporting documentation within 15

business days from the issuance of the FDA Form 483."[3]    On their final day, the FDA inspectors

told SCA that 483s are always "written in a way that never read well," but that would not be

"indicative of their experience with [SCA] here," commenting further that SCA had "been great

to interact with."

11.    SCA has always been and remains dedicated to meeting the highest standards, both

binding and nonbinding.    It intended, and still intends, to adjust its procedures to redress each of

the FDA's observations.    Accordingly, it began working on a 483 response as soon as it received

the 483 letter, formulating both substantive responses to the FDA's observations and concrete

---

[3]    U.S. FOOD & DRUG ADMIN., *What to Expect after an Inspection: 483s, Responses and Beyond*
(Dec. 14, 2022), https://perma.cc/76W7-BV5J.

plans to ensure that every identified issue would be promptly and fully addressed to the FDA's satisfaction.   SCA had already started executing these plans and had completed much of its remediation work when it filed this lawsuit.   It has now substantially completed its remediation efforts.

12.    But on November 2, 2023, nine business days after it issued the 483 and six business days before SCA's response was due, the FDA short-circuited its own established process to impose what amounts to the death penalty in this context.   In a telephonic meeting with SCA, citing certain (but not all) of the 483's observations, the FDA recommended that SCA "voluntarily" cease production at the Windsor Facility until achieving compliance with what the FDA considered to be the most serious observations.   It also requested that SCA "voluntarily" recall all products that have yet to expire.   This represents approximately **2.5 million units from 1,200 hospitals, worth some $36.5 million**, that are being used by countless healthcare providers and patients around the country.   The FDA gave SCA a 24-hour deadline to agree to the voluntary recall and shutdown.

13.    The FDA has an established, consistent practice for sanctioning firms that refuse to comply with such ultimatums.   Specifically, the FDA implements a statutory procedure for issuing an official public announcement ("Section 705(b) Notice"), on government letterhead, "warning" the public not to use any of the firm's products due to what the FDA terms the possibility of "serious and potentially life-threatening infections or death."   The FDA issues these notices under the auspices of its statutory authority to "disseminate[] information regarding . . . drugs . . . in situations involving, in the opinion of the Secretary, imminent danger to health."   21 U.S.C. § 375(b).   When the FDA has previously issued such notices in exercise of this statutory

authority, the practical effect has been to shut down the named compounder and render it a pariah—typically driving the manufacturer into bankruptcy or otherwise out of business.

14.    When SCA requested that the FDA give it more time because it was still formulating its 483 response, the FDA refused and demanded that SCA confirm within "24 hours" whether it would agree to the shutdown and expansive, all-encompassing recall.   Trying its best to cooperate, SCA wrote back to the FDA the morning of November 3, confirming that it had "stopped all production and distribution" from its Windsor Facility following its call with the FDA, that it had "begun remediation" to address the 483 observations, and that it would not resume production until it had made every effort to address the issues raised in the 483.   SCA reported that it required until Monday, November 6, to respond to the FDA's demand for a broader recall of all unexpired products manufactured at the Windsor site but communicated that it was eager to engage with the FDA further on the issue.   To make an informed decision, SCA requested that the FDA share the Health Hazard Evaluation ("HHE") that is meant to be the FDA's predicate for any such recall "request."

15.    Without responding to the request for its HHE, the FDA that same day "acknowledge[d]" SCA's decision to cease operations while continuing to "recommend that [SCA] immediately recall all sterile drug products."   In apparent preparation for the Section 705(b) notice that the FDA was poised to issue the coming Monday, the FDA requested that SCA "provide a list of all drugs that are currently on the market" that had come from its Windsor Facility, including the "date of production, date of release, [the] number of units released for distribution, [and] the number of units still waiting for distribution."

16.    The morning of November 6, SCA emailed the FDA to "reiterate [SCA's] request that the FDA please share its HHE so that it can help inform our decision" and to request

"additional time so that we can substantively engage as hoped on the modified, agreed scope of a limited recall, including as to the bases for same"; it also asked that the FDA "kindly respond before noon Eastern [that day], so that we know whether we will be receiving additional time enabling dialogue and information-sharing to continue." Out of an abundance caution and in an effort to accommodate the FDA, however, SCA informed the FDA it had initiated a limited recall tailored to the specific batches of products from which isolated particulates had been identified and removed, as reported by the FDA (the "Limited Recall").

17.     To be clear, SCA believed at the time, and still believes today, that the Limited Recall was unnecessary—there is no observation that the batches themselves were contaminated. As explained below, the sole issue according to the FDA is only that SCA did not further investigate why discrete products within discarded batches had failed visual inspection so as to trigger targeted remediation. Nevertheless, SCA decided to initiate the Limited Recall for the sake of going above and beyond in ensuring that any potential or perceived defects are addressed.

18.     The FDA never substantively responded to SCA's efforts to obtain the HHE and to compromise on the scope of the recall, apart from acknowledging receipt of SCA's email. The FDA has since confirmed that it had never prepared the HHE when it made its recall demand. Nevertheless, by all indications, the FDA had a Section 705(b) Notice drafted and set to issue against SCA on November 6.

19.     Without engaging substantively, the FDA has made clear that nothing short of an across-the-board recall of all SCA's unexpired medications will satisfy it. And the FDA has indicated that, per its standard, dreaded practice, any persisting request by SCA for further engagement or explanation will immediately trigger scathing condemnation of SCA's medications in terms that warn everyone against continuing to use them.

20.     The FDA's impending notice is unfounded and illegal in multiple respects.  To begin, the FDA has made no serious effort to explain or justify its rationale for concluding from its ten observations that *any* SCA medications, let alone *all* of them, pose "imminent danger to health," as the FDA must before passing procedural muster under the Administrative Procedure Act, 5 U.S.C. § 5 *et seq.* ("APA").  ***None of SCA's medications has been identified as contaminated or otherwise posing any demonstrated threat to patients' health***.  And far from being transparent about any operative rationale, as the APA requires, the FDA is taking the *opposite* approach by *withholding* critical particulars in the face of SCA's good-faith requests.  Indeed, a total recall is especially unnecessary given the Limited Recall.

21.     What is more, the FDA's indications to date make clear that it is improperly subjecting SCA to anomalous (albeit yet-to-be specified) standards.  Specifically, the FDA is mischaracterizing minor, isolated, attenuated findings as impugning the integrity of all of SCA's preparations, even though there is no plausible case to be made that its observations call into question the safety of any compound.   The only alleged statutory or regulatory violation that the FDA observed involved minor omissions on labeling for three drugs, and improper printing and shredding controls for certain documentation.   That is hardly cause for a full nationwide recall.  Tellingly, the FDA did not even cite those two violations—the only claimed violations of any established standard—as a reason for demanding a recall, and previously assured SCA that these technical violations did not pose "major issues."

22.     SCA had made clear to the FDA that it wishes to cooperate completely to ensure that all safety considerations are addressed consistent with best practices, as viewed by the FDA.  But a full recall goes far beyond those needs, would destroy SCA as a business, and would cause substantial patient access issues nationwide.   The Windsor Facility is responsible for 80% of

SCA's production and distribution.   A full recall would cost it tens of millions of dollars that it cannot afford, force it to lay-off hundreds of employees (most of whom are in Connecticut), and, ultimately, send it into a death spiral culminating in bankruptcy.

23.    The FDA's edict is not only unnecessary and damaging to a well-respected business, it would also undermine public health.   Many of the products that would be subject to the recall are in a state of shortage nationwide and are used mostly in the operating room, emergency room, and in labor and delivery in order to deliver critical care and save lives.   The recall, and a subsequent breakdown in SCA's business, would exacerbate these shortages, disrupt ongoing courses of treatment, and ultimately force hospitals and healthcare facilities to prepare for themselves the injectable and/or infusible pharmaceuticals SCA currently produces with the benefit of state-of-the-art facilities and practices.   Hospitals and healthcare facilities, by contrast, are subject to much less stringent regulatory guidelines and have less expertise in assembling these dosages in a sterile environment than registered manufacturers like SCA.   The net result of the FDA's actions, in sum, would be to compromise and disrupt ongoing courses of treatment, and to subject patients to pharmaceutical products that are less regulated and less safe.

24.    The FDA's conduct since SCA first filed this action is even more concerning. After the Court made several comments suggesting that the FDA would not prevail in its efforts to obtain dismissal of SCA's lawsuit, the FDA quickly agreed to a standstill order, and conveyed to the Court that, contrary to SCA's allegations, it was *not* preparing to issue a Section 705(b) Notice, while characterizing SCA's allegations as paranoid and "hypothetical."   But the FDA's actions have told a very different story.   Every time the FDA suffered a setback in this action, it has attempted to undermine the standstill order and retaliated against SCA for exercising its First

Amendment rights by filing this action. The FDA would not have undertaken any of these actions but for SCA's exercise of its First Amendment rights.

25. After SCA sued, the Court initially ordered and then the FDA quickly committed to, a standstill agreement, under which "the defendants agree to refrain from issuing a press release or similar public statement" until further notice by the FDA or ruling by the Court on SCA's request for a preliminary injunction. ECF 30; *see also* ECF 17 & 21. That standstill agreement has remained in place ever since.

26. The FDA has undermined the standstill agreement by informing state regulatory agencies in unprecedented fashion specifically about this lawsuit and its 483, effectively encouraging them to investigate and punish SCA as the FDA's proxy.

27. The FDA has also acted arbitrarily and capriciously, in violation of its own practices and regulations, and in violation of SCA's constitutional rights, by issuing an utterly baseless, unprecedented HHE ██████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████.

28. The highly irregular timeline surrounding these actions, the lack of basis for them, and the unprecedented nature of them together provide overwhelming indication that the FDA is undertaking systematic, concerted efforts to retaliate against SCA for pursuing this challenge and thereby to deter all other pharmacies from ever following SCA's example by invoking their legal rights against the FDA.

29. The First Amendment does not countenance such governmental retaliation. If permitted to proceed as it is, the FDA would successfully send the loud-and-clear, chilling message that no pharmacy compounder can ever come out ahead by petitioning a court for redress in the

face of the FDA's misconduct.   The FDA is using this instance to show that, no matter what a judge may decide, the agency will stop at nothing to decimate any pharmacy in SCA's position.

30.     In this action, SCA is respectfully asking this Court to enjoin and declare unlawful the FDA's unfounded public notice, private communications with state regulatory bodies, HHE, ████████████, and any other such adverse action the FDA might take.   Otherwise, the FDA will be putting at risk a trusted source of high-quality, necessary medications; triggering false alarms and disruptions for hospitals and patients who are today relying upon specialized products from SCA; and sending the signal that any other company who objects to the FDA's unlawful conduct will suffer retaliation and thus be crushed.

## THE PARTIES

31.     Plaintiff SCA Pharmaceuticals, LLC is an Arkansas corporation in good standing, with its principal place of business in Little Rock, Arkansas.

32.     Defendant U.S. Food and Drug Administration is a major operating division of the U.S. Department of Health and Human Services ("HHS"), a cabinet-level agency of the Executive Branch of the United States Government.   The FDA is the agency of the United States Government that administers the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–397.   HHS and the FDA are agencies within the meaning of the APA, 5 U.S.C. § 701(b)(1).

33.     Defendant Xavier Becerra is Secretary of Health and Human Services. Secretary Becerra is charged with administering the FDCA, including the adulteration provisions of 21 U.S.C. § 501.   As Secretary of HHS, Secretary Becerra has supervisory responsibility for the FDA.   Secretary Becerra has delegated his authority under the FDCA to the Commissioner of Food and Drugs.   Secretary Becerra is sued in his official capacity as Secretary of HHS.

34.    Defendant Dr. Robert M. Califf is Commissioner of Food and Drugs.   In that capacity, Dr. Califf has the authority and responsibility for administering the FDA and the FDCA, including matters delegated by the Secretary of HHS relating to investigations as well as the statutes and regulations at issue in this case.   Dr. Califf is sued in his official capacity as Commissioner of the FDA.

35.    Defendants the FDA, Becerra, and Califf will be collectively referred to hereafter as "the FDA."

## JURISDICTION AND VENUE

36.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant) & 2201 (injunctive relief).

37.    This Court has personal jurisdiction over the defendants.

38.    5 U.S.C. § 702 waives United States sovereign immunity for actions seeking declaratory and injunctive relief.

39.    Venue is proper in this District because the Defendants are officers of the federal government and a substantial part of the events giving rise to this claim occurred here, particularly at SCA's Windsor Facility.   28 U.S.C. § 1391(e)(1).

## FACTS

### I.    BACKGROUND

#### A.    Drug Compounding

40.    "Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient."[4]

---

[4]    *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360-61 (2002).

41.    "Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product."[5]

42.    Compounding is as old as the pharmaceutical industry itself.  Pharmacists are trained in compounding at pharmacy school and often perform compounding for individual patients at neighborhood retail pharmacies.  Compounding services can also be performed at pharmacy compounding facilities that are directed by licensed pharmacists.  These pharmacy facilities are able to compound more commonly requested variations of FDA-approved drugs and dispense compounded medications based on an individualized patient need.   They do not engage in the wholesale distribution of drugs or manufacture drug products at a commercial scale.

B.    **The Statutory Framework**

*Traditional Pharmacy Compounding*

43.    Historically, pharmacies and drugs have been regulated by the states as part of their regulation of health and medicine.   It was not until the turn of the century, with the passage of the Pure Food and Drug Act of 1906, that the Federal Government first became involved in regulating drugs.   In 1938, Congress replaced the Pure Food and Drug Act with the FDCA, 21 U.S.C. § 301 *et seq.*, to regulate drug manufacturing, marketing, and distribution.

44.    The FDCA did not upset the traditional regulatory structure for compounding, neither prohibiting traditional pharmacy compounding nor bringing it under the auspices of the federal regulation through the FDA.   "For approximately the first 50 years after the enactment of the FDCA, the FDA generally left regulation of compounding to the States.   Pharmacists

---

[5]    *Id.* at 361.

continued to provide patients with compounded drugs without applying for FDA approval of those drugs."[6]

45.    By the 1990s, Congress and the FDA grew concerned that lines between drug manufacturers and compounders were blurring.   To draw clear lines, Congress enacted the Food and Drug Administration Modernization Act ("FDAMA"), which expressly exempted compounders of human products from the FDCA's requirements for "new drugs," while establishing criteria to distinguish traditional compounders (who would remain regulated by states) from larger drug manufacturers then operating as compounders (who would be subject to the FDCA's new-drug requirements).

46.    Under the FDAMA, for example, to be exempt from FDA regulation, compounding must be performed by licensed pharmacists and cannot copy commercially available drugs.   21 U.S.C. § 353a(a), (b)(1)(D).

47.    In 2013, in response to safety concerns arising from the meningitis outbreak at the New England Compounding Center, Congress further amended the FDCA with respect to drug compounding in the Compounding Quality Act ("CQA"), 21 U.S.C. § 353 *et seq.*   Under these provisions—FDCA § 503A, 21 U.S.C. § 353a—qualifying compounders continue to be free to operate without the need to seek FDA approval for compounded drug products and are subject to state-law regulations.   These compounders are termed "503A compounding pharmacies" or "503A pharmacies."   "These facilities," according to the FDA, "may be subject to less stringent quality standards set in state law or policy," and "[s]uch standards may differ state to state."[7]   The

---

[6]    *Id.* at 362.

[7]    U.S. FOOD & DRUG ADMIN., *Compounding and the FDA: Questions and Answers* (June 29, 2022), https://perma.cc/X2FK-T8FD.

CQA also established "outsourcing facilities" subject to FDCA § 503A, 21 U.S.C. § 353a, or "503B manufacturers," that are "subject to increased quality standards" under federal law.[8]  503B manufacturers are inspected by the FDA "according to a risk-based schedule."[9]

### Safety and Sanitation Standards

48.     The USP is an independent, nonprofit organization that develops standards for making medications.   Although the USP is a non-governmental organization, Congress enshrined the USP standards as the gold standard in 1938 in the FDCA.   Multiple provisions of federal law still incorporate USP standards as appropriate standards of conduct.

49.     The USP standards contain detailed guidelines for both nonsterile and sterile preparations of compounded drugs.   The standards, contained in USP chapters 795 and 797, address the proper sanitary conditions, sterilization protocols, and drug compounding procedures, and they generally represent current knowledge of the best pharmaceutical procedures.

50.     Each of the 50 states, as well as the District of Columbia, regulates compounding pharmacies and pharmaceutical manufacturers based on the USP standards.   Many states have directly adopted the USP standards as the state standards.   Other states substantially incorporate the USP standards with certain modifications.   As a result, 503A facilities are generally subject to the USP standards.

51.     Pursuant to the FDCA, the FDA has created a separate, heightened set of standards that apply to 503B pharmaceutical manufacturers: the "Current Good Manufacturing Practices"

---

[8]     *Id.*

[9]     *Id.*

("cGMP standards").   21 C.F.R. parts 210 and 211.   503B facilities are subject to these detailed

cGMP standards, whereas 503A facilities are not.

52.     As a 503B facility, the Windsor Facility is held to established cGMP standards.

*Adulteration and Insanitary Conditions*

53.     The FDCA prohibits "[t]he adulteration or misbranding of any food, drug, device,

tobacco product, or cosmetic in interstate commerce."   21 U.S.C. § 331(b).   Section 351 defines

drugs that are "deemed to be adulterated" to include those that are "prepared, packed, or held under

insanitary conditions whereby it may have been contaminated with filth, or whereby it may have

been rendered injurious to health."   *Id.* § 351(a)(2)(A).

54.     In 2020, the FDA finalized its non-binding *Insanitary Conditions at Compounding

Facilities* guidance ("Insanitary Conditions Guidance") to guide compounding facilities on the

FDA's implementation of the adulteration and insanitary conditions provisions of the FDCA.   But

the FDA's "guidance" is no more than a non-exhaustive list of "examples of insanitary conditions."

No other guidance or regulation illuminates what standards determine whether the FDA will deem

a manufacturer to be "insanitary" such that the FDA will deem the manufacturer's compounded

drugs to be "adulterated."

55.     Congress instructed the FDA to use a specific set of procedures to enforce the

provisions of the FDCA, including the adulteration and insanitary conditions provisions.   These

procedures feature judicial remedies, like injunctions or seizures, 21 U.S.C. §§ 332, 334, and afford

regulated entities the all-important opportunity to contest the FDA's findings in a court of law.

56.     Over the last several decades, Congress has given the FDA statutory authority to order mandatory recalls of food, *see* 21 U.S.C. § 350*l*, and certain medical devices, *see* 21 U.S.C. 360h(e)(1), but it has never granted the FDA the authority to order recalls of drugs.[10]

57.     Nevertheless, the FDA has gone to considerable lengths to circumvent judicial review of its actions and the limits that Congress has placed on its authority.   When the FDA declares a manufacturer's facility "insanitary," it often demands a "voluntary" recall and threatens to issue a public statement warning against using the manufacturer's products.[11]   The FDA claims its authority to issue such a public statement from Section 705(b) of the FDCA ("Section 705(b) Notice"), which states that "[t]he Secretary may . . . cause to be disseminated information regarding . . . drugs . . . in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer."   21 U.S.C. § 375(b).

58.     Because many pharmacies and pharmaceutical manufacturers are small businesses facing challenging market conditions, the FDA knows that a Section 705(b) Notice poses an existential threat such that a manufacturer has no choice but to comply with the "voluntary" recall demand.

59.     For instance, following investigation of AmEx Pharmacy, the FDA made such an ultimatum to recall all of the pharmacy's products intended to be sterile.   When AmEx balked at recalling every one of its products, the FDA, rather than initiate an enforcement action to prove its

---

[10]     *See, e.g.*, Lars Noah, *Governance by the Backdoor: Administrative Law(lessness?) at the FDA*, 93 NEB. L. REV. 89, 127 (2014).

[11]     *See, e.g.*, *id.* at 127-29; *see also* Nathan Cortez, *Adverse Publicity by Administrative Agencies in the Internet Era*, 2011 B.Y.U. L. REV. 1371, 1372-73, 1375-76, 1401-15 (detailing the FDA's adverse publicity practices); *see generally* Ernest Gellhorn, *Adverse Publicity by Administrative Agencies*, 86 HARV. L. REV. 1380 (1973).

findings, issued a 705(b) Notice under the auspices of warning the public.   In the 705(b) Notice,

the FDA "warned" patients not to use any of the company's products, suggesting such use "may

result in serious and potentially life-threatening infections or death," despite the fact that "the FDA

[was] not aware of any reports of illness associated with the use of AmEx Pharmacy's drugs":

### The FDA warns patients and health care professionals not to use sterile products from Pacifico National Inc., dba AmEx Pharmacy

The FDA is warning patients and health care professionals not to use products intended to be sterile produced by Pacifico National Inc., doing business as AmEx Pharmacy, Melbourne, Florida, due to a lack of sterility assurance.   These drugs may pose a safety risk to patients.

Administration of a nonsterile drug intended to be sterile may result in serious and potentially life-threatening infections or death.

Health care professionals should immediately check their medical supplies, quarantine any drugs prepared by AmEx Pharmacy, and not administer or provide them to patients.   FDA urges health care professionals, who obtained products from AmEx Pharmacy, to make alternative arrangements to obtain medications from sources that adhere to proper quality standards. Patients who have received any drug produced by AmEx Pharmacy and have concerns should contact their health care professional.

FDA investigators recently inspected AmEx Pharmacy's facility in May 2019 and observed conditions that could cause AmEx Pharmacy's drugs to become contaminated or otherwise pose risks to patients.

On June 25, 2019, FDA recommended that AmEx Pharmacy voluntarily recall all unexpired drugs intended to be sterile and cease sterile operations until the company takes adequate corrective actions.   However, AmEx Pharmacy has not initiated the recall.[12]

60.    Just one month later, AmEx Pharmacy was forced to shut down.[13]

---

[12]    U.S. FOOD & DRUG ADMIN., *the FDA warns patients and health care professionals not to use sterile products from Pacifico National Inc., dba AmEx Pharmacy* (June 28, 2019), https://perma.cc/MBX4-4F6U.

[13]    *Id.* ("AmEx Pharmacy has not been operational since July 27, 2019.").

61.    AmEx Pharmacy later declared bankruptcy.[14]

62.    The FDA has employed the same playbook against numerous other companies including Standard Homeopathic Company, Inc. and Dedaus Inc.   *See* ECF 5-1.[15]

63.    In theory, the FDA has imposed regulations on itself that restrict its ability to demand a recall.   The FDA's regulations state that "[r]ecall is a voluntary procedure," and "recognize that recall is an alternative to a [FDA]-initiated court action" that would, of course, be subject to judicial review.   21 C.F.R. § 7.40(a).   According to the regulation, the FDA should not be pursuing a recall until it conducts a rigorous evaluation of the health hazard presented by a product being recalled (HHE), which evaluation must "take into account . . . the following factors":

> (1) Whether any disease or injuries have already occurred from the use of the product.
>
> (2) Whether any existing conditions could contribute to a clinical situation that could expose humans or animals to a health hazard. Any conclusion shall be supported as completely as possible by scientific documentation and/or statements that the conclusion is the opinion of the individual(s) making the health hazard determination.
>
> (3) Assessment of hazard to various segments of the population, e.g., children, surgical patients, pets, livestock, etc., who are expected to be exposed to the product being considered, with particular attention paid to the hazard to those individuals who may be at greatest risk.
>
> (4) Assessment of the degree of seriousness of the health hazard to which the populations at risk would be exposed.
>
> (5) Assessment of the likelihood of occurrence of the hazard.

---

[14]    *See In re: Pacifico National, Inc., d/b/a AmEx Pharmacy*, No. 6:20-bk-05009, ECF 1 (M.D. Fla. Bankr. Sept. 3, 2020).

[15]    SCA hereby incorporates by reference into its complaint all submissions submitted in this case to date, including, but not limited to, its papers in support of its motion for a temporary restraining order and preliminary injunction, *see* ECF 5, 5-1, 5-2, 5-3, 5-4, 5-5, 5-6, and its opposition to the FDA's motion to dismiss, *see* ECF 41.

(6) Assessment of the consequences (immediate or long-range) of occurrence of the hazard.

*Id.* § 7.41(a).  Based on this determination, the FDA must ███████████████████

████████████████████████████████████████████████

███████████████████████████████

64.    The FDA's regulations empower it to request that a firm initiate a recall only when it has determined "[t]hat a product that has been distributed presents a risk of illness or injury or gross consumer deception," and "[t]hat an agency action is necessary to protect the public health and welfare." *Id.* §§ 7.45(a)(1), (3).  Upon determining the propriety of the recall request, the FDA must "notify the firm of this determination and of the need to begin immediately a recall of the product," and this notification must be "by letter or telegram." *Id.* § 7.45(b).  The FDA's notification must "specify the violation, the health hazard classification of the violative product, the recall strategy, and other appropriate instructions for conducting the recall." *Id.*

65.    Despite all this, the FDA purports to be wholly unfettered in its use of the 705(b) Notices, which it may issue for any reason (or no reason), without ever making any external showing, answering to any external review, or even preparing an HHE.  By employing the above-described enforcement strategy, the FDA need never prove its findings, justify them to the relevant pharmacy (let alone a reviewing court), or even adhere to its own regulatory guidelines.  Instead, the FDA "requests" that any target pharmacy "voluntarily recall" all of its non-expired products, thereby incurring crushing expenses, burdens, and stigmas, lest the target pharmacy immediately suffer the FDA's wrath in the form of a 705(b) Notice that effectively ends the pharmacy's existence.  By developing and employing this strategy in case after case, the FDA is regulating via *ipse dixit* and steamrolling reputable pharmacies and pharmaceutical manufacturers while evading judicial review.

21

C.    **SCA's Windsor Facility Is A 503B Manufacturer**

66.    SCA is an FDA-registered Section 503B Outsourcing Facility subject to the FDA's heightened Current Good Manufacturing Practices (cGMP) regulations.   SCA's Windsor Facility has been in operation for six years, and its Little Rock Facility has been in operation for twelve years; it started in 2011, which was two years before 503B was even enacted by the FDA. Collectively, across both facilities, SCA produces and distributes approximately 7 million units of pharmaceutical products every year.   SCA counts among its clients some of the leading hospitals and healthcare facilities in the nation, including the hospital systems for the University of California San Francisco, Stanford University, Kaiser Permanente, New York University, Memorial Sloan Kettering, Pennsylvania State University, and Northwell Health.

67.    SCA's Windsor Facility purchases sterile, FDA-approved medications from leading pharmaceutical manufacturers (*e.g.*, Pfizer, Par Pharmaceuticals, and so on) combines, mixes, adds-to, and/or dilutes them into ready-to-administer dosages (frequently smaller package sizes than those in which they started) in a sterile environment, using sterile processes, and distributes those final products (injectable and/or infusible pharmaceuticals) to hospital customers for use emergency rooms, operating rooms, and labor and delivery facilities nationwide.   These products are primarily used for lifesaving, life-sustaining products used for critical hospital services, including pain management, anti-infectives, cardiovascular, anesthesia, OB/GYN, and renal disease.   The sterile drug products are packaged into syringes, IV bags, and Computerized Ambulatory Delivery Device cassettes.   Many of the ready-made injectable and infusible pharmaceuticals that SCA produces are in short supply nationwide and on the FDA's "shortage list."   Among the injectable pharmaceuticals that are produced by SCA and presently on the shortage list are Fentanyl citrate, Rocuronium bromide, Ketamine hydrochloride, Lidocaine

hydrochloride, Hydromorphone hydrochloride, Diltiazem hydrochloride, Epinephrine hydrochloride, Potassium chloride, Morphine sulfate, Midazolam hydrochloride, and Atropine sulfate.

68.    Given these shortages, absent SCA's production, the hospitals and healthcare facilities that rely on SCA's products, many of which are subject to nationwide shortages, would have to produce these ready-made injectable pharmaceuticals themselves at in-house 503A hospital pharmacies, or even at patients' bedsides, which are not subject to cGMP standards.

69.    SCA is licensed in 49 states (every state except North Dakota) and Washington, D.C.  It operates in compliance with the applicable laws of these states and district, Section 503B of the Federal Food, Drug and Cosmetic Act, and all applicable federal statutory and regulatory requirements.  It undergoes routine in-person inspections by the U.S. Drug Enforcement Administration and multiple state boards of pharmacies, including the California, Virginia, and Michigan Boards of Pharmacy.

70.    The Windsor Facility was inspected by the FDA in 2019, and the FDA issued a close-out letter in 2021 concluding that all issues that had arisen during the 2019 inspection had been resolved.   The FDA also inspected the Little Rock Facility in 2019, SCA promptly resolved all issues found, and the FDA closed out its inspection in 2021.

71.    SCA has not rested on its laurels since these successful inspections.  It has continued to invest in and strengthen the compliance procedures in both its Windsor and Little Rock Facilities.

72.    From May 2 through 17, 2023, the FDA inspected the Little Rock Facility again, during which time it spent a total of 10 days on-site reviewing and observing protocols and practices paralleling those at the Windsor Facility, and issued a 483 containing four minor

observations, which SCA promptly responded to and rectified without adverse incident. The FDA closed out this investigation via FMD-145 Release of the Establishment Inspect Report only 90 days later, a very fast timeline.

73.    Given that the FDA inspects 503B manufacturers "according to a risk-based schedule,"[16] this lag-time almost certainly reflects a judgment that SCA's facilities, which process exclusively sterile products purchased from other leading manufacturers, are at low risk of significant contamination issues.

74.    Finally, in October 2023, the Windsor Facility was inspected by and received on time, first pass license renewal from the California Board of Pharmacy.   ECF 5-5 ¶ 9.

## II.    THE FDA'S UNLAWFUL RECALL DEMAND AND SECTION 705(B) NOTICE

### A.    The FDA's Inspection of SCA's Windsor Facility

75.    From September 18 through October 20, 2023, over 15 business days and partly concurrent with the California Board of Pharmacy's inspection, the FDA initiated and conducted a sweeping inspection of SCA's Windsor Facility.  The inspection included multiple wide-ranging tours of the facilities, discussions with key departments in the facility, observations of various operational processes and activities, including cleanroom manufacturing, review of SCA internal data and documents, and extensive discussions regarding the safety techniques that SCA employs in the facility.

76.    SCA fully cooperated with the FDA's inspection and afforded the FDA unfettered access to its facilities.

---

[16]    *Compounding and the FDA: Questions and Answers*, U.S. FOOD & DRUG ADMIN. (June 29, 2022), https://perma.cc/X2FK-T8FD.

77.     The FDA is empowered during these investigations to take samples of products, as well as environmental and personnel samples, to test for contamination, and often does so, especially when there is any concern that a product may be compromised or pose risks for patients. The FDA, however, *declined* to take *any* samples from SCA's Windsor Facility.

78.     The FDA inspectors spoke extensively with SCA employees throughout this process regarding their observations and the procedures that SCA had in place.   The FDA inspectors' comments were overwhelmingly positive and complimentary regarding SCA's patient compliance efforts.    Inspectors, for example, specifically praised SCA's environmental monitoring program for contamination control in its facilities, stating on the third and fifth day on site that they could tell that SCA "spent a lot of time developing [its] [environmental monitoring] program."

79.     On October 13, the FDA officials provided an overview of the observations they would provide on their forthcoming Form 483.[17]    The officials reiterated that it was "great to work with" SCA, and let them know that all 483s are "written in a way that never read well," but that SCA should "not" take the tone of the 483 as "indicative of [the officials'] experience with" SCA.

**B.      The Inspectors' Observations**

80.     On October 20, 2023, the FDA concluded its inspection and issued a Form 483 listing ten observations regarding the Windsor Facility.   A true and correct copy of the 483 is available at ECF 1-1 and is hereby incorporated in this Amended Complaint by reference.

---

[17]     A 483 is the report issued to management after an FDA inspection that lists observations of conditions of the facility.    These "observations" identify potential areas of noncompliance.

81.     At no point during the month-long inspection process did the FDA's inspectors even purportedly observe that any product released to the public was potentially adulterated in any way.   And SCA is not aware of any product complaints or adverse events related to particulate matter associated with the products produced by the Windsor Facility.

82.     The FDA's ten observations pertained to minor, redressable, and isolated incidents. They do not demonstrate insanitary conditions that justify total recall of drugs from a compounding facility.   And, apart from a few technical violations that the FDA does not contend pose a risk to health or human safety, the FDA on the 483 has not identified any regulations or statutes that SCA had violated.   This is noteworthy because 483s usually and properly include such specifications.

83.     The first two observations, for example, criticize the process that SCA's "quality control unit" put into place during the "visual inspection" phase of SCA's safety review.   The visual inspection phase is the last step in the redundant measures that SCA employs to find potentially tainted products.   After products have passed close inspections using lab techniques, the products are visually inspected by individuals who discard *every* product that appears potentially flawed in any way, whether the defect is trivial (*e.g.*, smeared ink on a syringe) or critical (*e.g.*, liquid leaking from a syringe).   They also classify the defects of products they discard.   Notably, SCA employs the *same* quality control procedures for visual inspection in its *Windsor Facility* as it employs in the *Little Rock Facility* that the FDA recently inspected and effectively endorsed via prompt close out just a short few months later.

84.     Despite giving SCA's quality control procedures a positive close-out letter on the visual-inspection process in Little Rock just six months ago, the FDA faulted those same procedures this time, in Windsor.   At the same time, the FDA did not find that SCA had ever released a defective product.   Rather, it criticized SCA for failing to "identif[y] [the] particulates

found during the investigation process," not "opening [] an investigation" every time a product fails a visual inspection in any way, and not calculating the percentage of products that are removed from every batch (that is, the "yield").

85.     Federal regulations, however, do not require such identifications, investigations, or yield calculations.   A 2021 FDA "Draft Guidance," which, the FDA states in a header atop every page, "***Contains Nonbinding Recommendations***," *recommends* "particulate identification" and "investigation" as part of the visual inspection process, but does not *require* it.[18]   In other words, the FDA appears to have used those first two observations to impose on SCA guidance that is not legally binding, has not gone through notice and comment, and does not come close to notifying regulated entities that they *must* adopt the FDA's recommendation, on pain of death.

86.     This is not the first time the FDA has tried to overstep its statutory authority.   In 2016, a House Appropriations Committee Report highlighted that the FDA was subjecting compounding facilities to an improperly high standard of compliance:

> The Committee understands that the FDA is interpreting provisions of Section 503A of the FDCA to inspect state-licensed compounding pharmacies under current Good Manufacturing Practices (cGMPs) instead of under the standards contained in the United States Pharmacopeial Convention (USP) . . . .The Committee reminds the FDA that compounding pharmacies are not drug manufacturers, but rather, are state licensed and regulated health care providers that are inspected by state boards of pharmacy pursuant to state laws and regulations . . . .Compounding pharmacies are more appropriately inspected using USP standards or other pharmacy inspection standards adopted by state law or regulation in the state in which a pharmacy is licensed.[19]

---

[18]     U.S. FOOD & DRUG ADMIN., *Inspection of Injectable Products for Visible Particulates Guidance for Industry*, at 1 (Dec. 2021), https://perma.cc/8TAD-JAPQ.

[19]     H.R. REP. NO. 114-531, at 69 (2016).

87.     The FDA is doing the same thing again, albeit now in the 503B context.   But the APA does not permit an agency to disregard the statutory and other limitations that are part and parcel of the rule of law.

88.     Observations three through seven of the 483 relate to the procedures in place in SCA's "clean room" where trained SCA employees compound products starting with FDA-approved sterile products they purchase from leading pharmaceutical manufacturers.

89.     Observation three, for example, concerns the Chemistry lab's subvisual particle matter test that SCA performs on all its finished products consistent with federal regulations.   It initially performs a "Test Method 1 (Light Obscuration Particle Count Test)" and, if a sample fails that test, performs a more exacting "Test Method 2 (Microscopic Particle Count Test)."   The difference between these two tests is akin to that between an X-ray and a CT scan: the former provides high-level notifications of a potential issue, but the latter allows someone to zero in and determine whether the purported anomaly is actually a problem or not.   UPS 788, which sets standards for testing particulate matter in injections, endorses this method: "it may be necessary to test some preparations by the Light Obscuration Particle Count Test followed by the Microscopic Particle Count Test to reach a conclusion on conformance to the requirements."   It also states, for Test Method 1: "If the average number of particles exceeds the limits, test the preparation by the Microscopic Particle Count Test (TM2)."   The FDA is now criticizing SCA for a "failure to thoroughly review any unexplained discrepancy" between Test Methods 1 and 2 if a product fails the former and passes the latter.   Yet no such review is required by regulation, nor is it clear what sort of review the observation contemplates.   Moreover, the FDA also acknowledges that there have been *only 38* batches of products where there has been such a discrepancy *in the last four years*, during which time, the Windsor Facility has released *tens of thousands* of batches.

90.    Another portion of observation three concerns failures in a sterility testing method that SCA employs (BioMerieux ScanRDI) that had out-of-specification results 29 times since 2019.   Every time this test returned such results, SCA "rejected" every single unit in the impacted batch, yet the FDA faulted SCA for failing to investigate the cause of each failure.   This concern will soon be moot, however, because SCA has already begun migrating from the ScanRDI sterility test to a more advanced "Celsis Method" for sterility testing.   The Little Rock Facility also employed the same ScanRDI sterility tests that the FDA criticized in its Windsor Facility 483, yet the FDA had no observations of concern about these tests in its May 2023 Little Rock inspection.

91.    A final part of observation three notes that there had been "incidences of foreign materials found in syringe tray packs," such as "cardboard and hair," and, while SCA "rejects" any "product found to be associated with tray packs in which foreign material was identified," it did not "track or trend operators who identify[] foreign materials."   That ancillary concern about tracking SCA's human "operators" is well removed from the "foreign materials" that have been systematically "identif[ied]" and removed by SCA without any alleged failure.

92.    Observation three, in short, does not concern any issues relating to patient safety, just failures to further investigate—through still more layers of prophylaxis and protocols—every conceivable anomaly that might arise.

93.    Observation four concerns the failure to set "[w]ritten procedures" "to ensure consistency and adequacy of cleaning," including failure to ensure that the cleaning product is used in the same quantity on each bin carrying products (or "totes"), and failure to ensure that the cleaning product is applied for five minutes exactly.   SCA has no issue with adhering to these requirements and has committed to memorializing and following the FDA's proposals before it

commences production.   But these procedures do not implicate SCA's ability to catch visual or microscopic defects or contaminations in its products.

94.    Observation five concerned a few technical failures to abide by all written standard operating procedures while the FDA was present, including one instance in which an "aseptic Assistant [] was observed to touch items" that were not sterile and then "reach[] into" a lab hood "to provide additional starting materials and retrieve finished product" without changing gloves. These errors are, of course regrettable, but the FDA observed only three such minor instances over its month-long inspection, and do not come close to suggesting that all products—or frankly any products—ever produced by the Windsor Facility products are tainted.

95.    Observation six criticizes SCA's environmental monitoring program for failing to test Aseptic Assistants' gloved fingertips or sleeves, and similar minor discrepancies, in its sterility auditing procedures.   But this is the same environmental monitoring program that the FDA investigators praised as having had "a lot of" time put into it, without raising any bottom-line concerns about product safety.

96.    Observation seven cites scratches that appear on the plastic totes that SCA uses to transport materials and finished pharmaceutical products, as well as an internal SCA assessment that found contamination in 3% of its totes that SCA self-identified and is working to resolve.   But any perceived problems with potential contamination in the totes are resolved by the other layers of contamination testing, described in part above, which are designed to weed out and catch any actual threat to pharmaceutical products.

97.    Observations eight through ten concern paperwork failures.   Observation eight describes two investigations into potential product issues reported by customers over the last several years that were closed, based on SCA being unable to "confirm[]" the accuracy of the

complaints, without SCA first "test[ing]" the returned products that were the subject of the complaints.  Observation nine describes the lack of purportedly appropriate controls "exercised over computers to assure that changes in master production and control records . . . are instituted only by authorized personnel."  And observation ten states that "some . . . drug product labels did not include the complete established name of the drug product," and specifically lacked "the name of the salt (e.g., citrate, bitartrate, and hydrochloride) in addition to the base on the label."

98.    Of these observations, the FDA tied only observations nine and ten—which no one can misperceive as implicating product safety, and which the FDA has not raised in its facility closure and recall discussions—to actual violations of present regulatory requirements.

**C.    The FDA Issues An Ultimatum to SCA**

99.    The 483 Form itself carries no sanction and, according to the form itself, does "not represent a final Agency determination regarding [a company's] compliance."  Rather, the observations are just that: "inspectional observations" that are meant to commence an iterative process.  And again, the FDA inspectors assured SCA on their final day of inspections that 483s "never read well" and that the 483's tone was not "indicative of their experience" with SCA's actual practices and procedures.

100.    The FDA's website states that "firms are encouraged to respond to the FDA Form 483 in writing with their corrective action with supporting documentation within 15 business days from the issuance of the FDA."[20]  This allows the entities to provide additional context, corrections of the FDA errors, or an explanation of remedial actions taken in response to the FDA findings.  The FDA's own 2023 Investigations Operations Manual allows (at § 5.11.4.3.15)

---

[20]    U.S. FOOD & DRUG ADMIN., *What to Expect after an Inspection: 483s, Responses and Beyond* (Dec. 14, 2022), https://perma.cc/76W7-BV5J.

companies to submit "an adequate response to the FDA-483 . . . within 15 business days."[21] Nevertheless, the FDA without prior notice (and contrary to the expressly-specified timetable) short-circuited its guaranteed process, issued an ultimatum, and demanded a response to that ultimatum, a week before that 483 response deadline expired.

101.    Specifically, on the afternoon of October 31 (Halloween), or 11 calendar days after the 483 was issued, the FDA contacted SCA by email to request "a meeting" within "the next two days."   The email stated that the call was not meant "to discuss the FDA 483" but rather was intended to "discuss the firm's plan for product on the US market."

102.    SCA's leadership had a call with the FDA officials, within two days as directed, at 10:00 a.m. ET on November 2, last Thursday.

103.    At the meeting, the FDA officials (not the original investigators who issued the 483 observations) stated that they recommended immediate cessation of production and distribution based on concerns flagged within the 483, despite the FDA's earlier statement by email that the purpose of the call was *not* to discuss the 483.

104.    The "most objectionable" concerns flagged in the 483, according to the FDA, were observations one through three (the failure to investigate visual inspection failures or divergences between Test Methods 1 and 2).   The FDA did not raise observations eight, nine, or ten as grounds for concern.

105.    At the end of its recitation of the relevant 483 observations, the FDA stated that it was recommending that SCA's Windsor Facility initiate a recall of all sterile drug products that

---

[21]    *Available at* https://perma.cc/R4KV-LM2B.

had not yet expired, cease production until it had taken adequate corrective actions, and notify the FDA before SCA recommenced sterile drug production.

106.    SCA assured the FDA that these issues were its top "priority," that "safety" was its "number one concern," and that it needed more time to assess the risk of products in the market before it could commit to a recall.

107.    The call lasted only 17 minutes in total.

108.    The FDA immediately followed up by email at 10:39 a.m. on November 2, repeating its request for a voluntary recall of all SCA products and immediate cessation of production.   A true and correct copy of the parties' email exchanges is available at ECF 1-2 and is hereby incorporated in this Amended Complaint by reference.   After reciting the issues contained in the 483, the FDA stated that "the observations made" in the 483 "have resulted in the following violations: 21 U.S.C. § "501(a)(2)(A): Because drugs were prepared, packed, or held under insanitary conditions whereby they may have been contaminated with filth, or whereby they may have been rendered injurious to health," and 21 U.S.C. § "501(a)(2)(B): Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP."   The FDA did not, however, specify the health hazard classification of the violative product, as its own regulations require.   21 C.F.R. § 7.45(b).   The SCA demanded "**a response within 24 hours**" to its purported request for an all-encompassing recall (emphasis in original).

109.    At 10:30 a.m. on Friday, November 3, within the 24-hour deadline, SCA responded by email, "confirm[ing] that" it had "stopped all production and distribution from" its Windsor Facility, and that "[p]roduction will not resume until we have made every effort to address the issues you have raised verbally and via the Form 483."   SCA, however, required an additional "1.5 business days (until Monday 11/6)" to "make an informed decision" as to whether it would

implement the "broader recall of all unexpired products," and requested that the FDA share its HHE "that informs its perspective" regarding the supposed need for a recall.

110.    As discussed below, the FDA has since admitted that it had ***never*** prepared an HHE when it made this recall request, violating its own regulations that require it to prepare one before requesting a recall.   The FDA thus demanded a recall in violation of its own regulations.

111.    At 5:11 p.m. that same day, the FDA responded that they "do not concur with" SCA's course of action.   The FDA "acknowledge[d] [the] decision to cease[] operations" but "continue[d] to recommend" an immediate and total recall, and requested a final decision on that front by close of business today—Monday, November 6.

112.    The FDA is telegraphing to SCA that the FDA has resolved to issue a Section 705(b) Notice warning against any continued use of the Windsor Facility's products, just as the FDA has repeatedly done in other such cases, unless SCA "voluntarily" proceeds with the total recall of all products precisely as the FDA has requested.   Indeed, in its Friday evening email, the FDA asked SCA to "provide a list of all drugs that are currently on the market with date of production, date of release, number of units released for distribution, number of units still waiting for distribution, BUD, Lot Number, and drug name."   The apparent purpose of this demand was to help the FDA to issue its Section 705(b) Notice calling out those drugs.

113.    In demanding a recall and threatening a Section 705(b) Notice, the FDA is pretermitting any response to the 483—which SCA should have additional time to respond to, according to the FDA's own specified timetable—and is refusing to engage meaningfully or answer basic questions about the scope and premises of any such expanded recall.   The FDA well knows that it has the power to destroy a business by just initiating an investigation and issuing a damaging public warning without ever having to prove anything in court.

**D.    The FDA Is Holding SCA To A Higher Standard Than Other Manufacturers**

114.    The FDA's actions also show that it is treating SCA differently from similarly-situated companies, without any justification.

*Baxter*

115.    From January 19, 2023 to January 27, 2023, the FDA conducted an inspection of an Indian subsidiary of Baxter International, Inc. ("Baxter") that sells drug products in the United States.

116.    The FDA issued its 483 observations for Baxter on January 27, 2023, which are available at https://www.fda.gov/media/175813/download?attachment.

117.    Observation 1 of the Baxter 483 relates to Baxter's "failure to thoroughly review any unexplained discrepancy [in the visual inspection process] and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has already been distributed."

118.    Observation 1 states that Baxter's "automatic visual inspection machine … failed to reject all defective vials," and that "[t]here was no non-conformance investigation opened to evaluate the impact of this failure on whether a previously released product within expiry that used the deficient visual inspection process, evaluate whether a field alert was necessary, or evaluate the impact for the continuing use of the visual inspection equipment.  Despite the failure of the existing recipes during challenge tests, the same instrument recipes were used in continuing visual inspection until October 13, 2022, for batches released to the US market.**"**

119.    The Baxter 483 thus identifies defects in Baxter's visual inspection process, much like the FDA's 483 faults SCA's visual inspection process.

120.    The Baxter 483 also faults Baxter for failing to investigate whether any previously released products used the deficient visual inspection process.   This is worse than the FDA's 483 for SCA, which faults SCA for failing to investigate discrepancies in inspections for lots that were *rejected*.

121.    Baxter is also a larger drug manufacturer than SCA and thus problems in its facilities by definition pose a substantially larger risk of contamination to the United States public than SCA products could.

122.    Yet the FDA has not demanded that Baxter issue a full recall.   Nor has it issued a Section 705(b) Notice or any other public notice or classification warning the public against using Baxter products.

123.    The FDA's differential treatment of Baxter and SCA cannot be explained by any public health justification.

124.    Notably, the FDA "relies on . . . user fees paid by industries that make and market FDA-regulated products."[22]   "[T]he FDA and industry negotiate agreements on user fees . . . ."[23]

125.    Baxter pays millions of dollars in user fees to the FDA every year because it is such a large drug manufacturer.   SCA, by contrast, is a far small organization, that only pays tens of thousands of dollars in user fees every year.

126.    On information and belief, the FDA is singling out SCA either for no reason, or, worse, because SCA pays less user fees.

### *Eugia*

---

[22]    U.S. FOOD & DRUG ADMIN., *FDA: User Fees Explained*, https://www.fda.gov/industry/fda-user-fee-programs/fda-user-fees-explained.

[23]    *Id.*

127.    The FDA has also treated SCA differently than Eugia Pharma, another drug manufacturing company that dwarfs SCA in size and user fee payments.

128.    The FDA conducted an inspection of a Eugia facility from January to February 2024 and issued its 483 on February 2, 2024.

129.    Observation 5 of the Eugia 483 states: "There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed."

130.    This observation is all the more concerning because Eugia's parent company still has an open recall, dating back to 2022, based on particulates being in sterile injectable vials.

131.    Yet the FDA has not demanded that Eugia issue a full recall, issued a Section 705(b) Notice or any other public notice or classification warning the public against using Eugia products.

132.    The FDA's differential treatment of Eugia and SCA cannot be explained by any public health justification.

133.    The FDA has singled out SCA either for no reason, or, worse, because SCA pays less user fees.

**E.    The FDA's Decision Will Cripple SCA's Business And Harm Public Health**

134.    The looming, existential threat that SCA faces defies quantification.

135.    A total recall of SCA's products from its Windsor Facility would impose staggering costs on SCA and tip it into bankruptcy.   The immediate cost of the recall would require SCA to buy back 2.5 million doses from 1,200 hospitals across the country and reimburse its customers more than $36.5 million.   SCA would also have to dispose of approximately $9 million in other raw materials at its facilities, bringing the total cost of the recall to $45.5 million immediately. The true cost, however, would be far greater, as SCA's supply contracts would also require it to

pay for its customers to secure replacement products for all the products it recalled.   It would be virtually impossible to sustain financially even SCA's smaller Little Rock Facility.   These costs collectively would be unaffordable and inevitably tip SCA into bankruptcy, and SCA would have to immediately lay off hundreds of its employees the moment the recall went into effect.

136.    The other path that the FDA has waiting for SCA is no less fatal for SCA.   A Section 705(b) Notice claiming that all of SCA's products from its Windsor Facility pose an imminent danger and should not be used by anyone would destroy SCA.   Such a statement on federal agency letterhead, no matter how unwarranted or defective, will threaten to eviscerate public confidence in SCA's products and reputation and to deter patients and providers.   The FDA's threatened Section 705(b) Notice will cause SCA to suffer irreparable harm in the form of loss of reputation, loss of trade, loss of goodwill, and even loss of its existence.   And it would immediately cause countless customers to stop using SCA products out of precaution, as any hospital would feel pressure, consistent with its ethical obligations and concerns regarding legal liability, to eschew pharmaceutical products from a facility that the FDA has denounced as unsafe, no matter how arbitrary or unfounded the FDA's warning is.

137.    SCA's monetary damages, even if quantifiable, will nonetheless be irreparable in the face of the FDA's sovereign immunity.

138.    By destroying SCA, the FDA will be hurting public health.   A significant portion of the drugs from the Windsor Facility that would be subject to the recall are on the FDA's shortage list and are desperately needed in emergency rooms, operating rooms, and for labor and delivery. Shutting down SCA via the recall or the Section 705(b) Notice would deprive many patients of the drugs they need.   And hospitals would inevitably try to replace the drugs lost through the recall (and future production when SCA is wiped out) by compounding the products themselves bedside

or in 503A pharmaceutical hospitals that are subject to fewer regulations and lower safety standards than SCA.

### III.    THE FDA'S RETALIATORY CAMPAIGN AGAINST SCA

139.    Ever since SCA sued the FDA, the FDA has undertaken a campaign of harassment against SCA in retaliation for its bringing this lawsuit, in brazen violation of SCA's First Amendment right to petition the Courts for redress of grievance.

140.    This campaign has been multi-faceted and systematic.   Although the known facts reflect only the tip of the larger iceberg, it has already become evident that the FDA, amidst the standstill, has been siccing state agencies to investigate and retaliate against SCA in the FDA's stead; that the FDA, in violation of its own regulations, secretly cooked up an after-the-fact, improper, HHE (which the FDA then *later revised*) in an effort to destroy SCA's business and to backfill the FDA's nonexistent record to justify its actions under challenge; and raced in bad faith to falsely and publicly ███████████████████████████████████████, without permitting this Court fair notice and opportunity to enforce the standstill order.   Any of these alone would be improper.   The combination of them reflects egregious, studied misconduct by a federal agency in an effort to thwart, discourage, and moot judicial review.

141.    The evidence of the FDA's retaliatory intent is overwhelming.   In key respects, its actions have been unprecedented and in flagrant violation of its own internal regulations and procedures; its public health justifications for its actions are non-existent; each retaliatory action was cued to an adverse development in this case; and the FDA has resisted all discovery that SCA has requested, while dissembling, and at times, outright misrepresenting the facts before the Court. As a result, the Court itself has ████████████████████████████████████████████ ████████████████████████████ issued a temporary restraining order ("TRO") ████████████

████████████████████████████████████████████████████

███████████████████████████████████████.

142.    This conduct by the FDA cannot plausibly be explained by any actual public health concern.   Rather than litigate this action on the merits and stand behind its (baseless) recall and shutdown demand, the FDA has repeatedly maintained that there is no genuine dispute between the parties.   The FDA thus accused SCA of "shadowboxing" with a "hypothetical statement," ECF 32-1 at 16, 18, and even latched onto a quotation from SCA's briefing to suggest any perceived dispute amounts to "'a figment of SCA's imagination,'" ECF 57 at 2.   The FDA then went outside the Complaint's pleadings to assure the Court that it had no desire to act against SCA, representing to the Court that "[t]he agency did not have [a] draft" Section 705(b) Notice," and that, to its counsel's "knowledge," no individual at the FDA had prepared any such draft.   *See* ECF 60 at 5:20-6:1.

143.    The FDA's actions preceding the Complaint and its retaliatory conduct confirm that there is very much a controversy.   But the FDA's denial of that basic fact in open court illustrates that the FDA knows its public health concerns cannot withstand public scrutiny, and that its present actions are being undertaken to retaliate against SCA for standing up to the FDA.

### A.    The FDA Retaliates Against SCA By Encouraging State Agencies To Investigate And Punish SCA

144.    After SCA sued, the Court initially ordered and then the FDA quickly committed to a standstill agreement, such that "the defendants agree to refrain from issuing a press release or similar public statement" until further notice by the FDA or ruling by the Court on SCA's request for a preliminary injunction (the "Standstill Agreement").   ECF 30; *see also* ECF 17, 21.   The Court also ordered that, "[i]f circumstances change, and the FDA attests there is a serious public health concern requiring immediate public notice, the defendants will notify the Court" (the

"Standstill Order").   ECF 30.   That Standstill Agreement and Standstill Order have remained in place ever since.

145.    As the litigation progressed, SCA continued to seek, via repeated requests, information regarding the HHE.   On November 13, SCA served limited requests for production and interrogatories on the FDA that were narrowly tailored around the justiciability of the dispute and the core merits of SCA's preliminary injunction request.   SCA's discovery included a Request for Production of Documents of any HHE "prepared in connection with the FDA's November 2023 request for a recall by SCA . . . including any and all documents relied upon for, referenced in, accompanying, or appended to same."   ECF 26-1 at 2.   Once the FDA made clear that it would not produce any discovery to SCA, SCA moved to compel discovery.   ECF 26.

146.    At a November 16 status conference concerning SCA's request for discovery, the Court expressed skepticism about the FDA's jurisdictional objections to SCA's suit.   *See* ECF 36-3 at 17:9-12 ("THE COURT: If I accept the truth of the complaint, it appears to me that" SCA has shown that it is entitled to a temporary restraining order or preliminary injunction.).   The FDA then quickly agreed to a suggestion that the Court postpone briefing and a decision on SCA's preliminary injunction motion until after resolution of the FDA's forthcoming motion to dismiss, even though this effectively prolonged the Standstill Agreement and Standstill Order.   *Id.* at 19-21.

147.    But while the FDA was prolonging the Standstill Agreement and Standstill Order in court, it sought to undermine and circumvent the Standstill Order behind the scenes, in retaliation for suffering these initial setbacks in court.

148.    SCA learned on November 30 that the FDA had provided a copy of its 483 observations, and called attention to the SCA Complaint, to the National Association of Boards of

Pharmacy ("NABP"), which promptly and predictably transmitted these materials to state boards of pharmacy, and encouraged the state boards to contact the FDA to learn more about the information. *See* ECF 39-2. The NABP represents the state boards of pharmacy, which all regulate SCA.

149. The NABP memorandum to the state boards disclosed:

> The Food and Drug Administration (the FDA) ***has shared with NABP*** the results of a recent inspection of SCA Pharmaceuticals, a 503B outsourcing facility located in Windsor, CT. the FDA also shared the facility's response. . . . In addition, ***the FDA indicates that SCA has filed a complaint in the US District Court for the District of Connecticut requesting emergency injunctive relief in light of the FDA's request for a recall of all sterile products within expiry***. *See* Civil Action No 3:23-CV1462. To date, SCA has conducted a narrower recall of certain sterile products within expiry. ***If you have any questions, please contact the FDA*** at compounding@the FDA.hhs.gov.

*Id.* (emphases added).

150. SCA learned about this development from the Colorado Board of Pharmacy, which appended the NABP memorandum to a letter seeking a response from SCA.

151. The FDA did not disclose its communications with the NABP or state boards of pharmacy.

152. SCA reported this development to the Court on December 4, 2023.

153. It remains unknown the extent to which the FDA may have embellished its behind-the-scenes communications with state boards and the NABP in the hope that they might proceed against SCA as the FDA's proxies, even as the FDA purports to adhere to its Standstill Agreement.

154. The FDA has refused to produce any discovery regarding its communications with state boards of pharmacy or the NABP, nor did it notify the Court about its communications amidst the Standstill Order.

155.    Whatever the FDA told the NABP and the state boards had predictable adverse effects on SCA.

156.    The NABP memorandum was appended to a letter from the Colorado State Board of Pharmacy, also dated November 30 (suggesting that the FDA may have told it about this dispute in advance), that demanded SCA respond within 10 days to the FDA's 483.   ECF 39-1.

157.    The FDA's decision to provide the results of the 483 and SCA's Complaint to the NABP, and its encouragement to state boards to contact it privately, is highly unusual and, to SCA's knowledge, unprecedented.

158.    The clear inference from the extreme unusualness of this decision, coming on the heels of the FDA agreeing to prolong the Standstill Agreement and Standstill Order indefinitely, is that the FDA was seeking to retaliate against SCA for its pursuit of this lawsuit.

159.    The FDA contacted NABP with the expectation and desire that NABP would pass along the FDA's views to state boards of pharmacies, and that the state boards would understand the FDA's prodding to be an invitation and encouragement to do what the FDA could not:   punish SCA and publicly declare SCA's products from its Windsor Facility to be unsafe to human health.

160.    This inference of retaliatory bad faith is all the stronger because the FDA's actions violated the spirit, if not the letter of the Standstill Agreement and Standstill Order.

161.    The FDA almost certainly provided this information after it previously "agree[d]," in open court, "to refrain from issuing a press release or similar public statement until a decision has been made on [SCA's] pending motion for preliminary injunctive relief," and that "[i]f circumstances change, and the FDA attests there is a serious public health concern requiring immediate public notice, the [the FDA] will notify the Court."   ECF 30.

162.    The FDA never suggested that it would be doing what it has unilaterally done, behind the scenes, to flag for NABP (and thus all state boards) that it had requested "a recall of all sterile products within expiry" and that SCA "filed a complaint" as a result.

163.    As further evidence of the FDA's bad faith and retaliatory animus, the FDA has dissembled over its communications with NABP and state boards of pharmacy, rather than coming clean and defending its actions on the merits.

164.    In a filing to this court, it characterized the NABP memorandum as evidence merely that "a non-profit organization informed its members about the FDA Form 483 for SCA's Connecticut facility, SCA's response, and SCA's filing of this lawsuit," and a mere "communication between a trade association and its members."   ECF 53 at 4.

165.    This is of course false:   as the NABP memorandum states, the FDA "has shared with NABP" all these materials.

166.    If the FDA had nothing to hide, it would have acknowledged what it had itself done, and defended its actions on the merits.   Its failure to do so affords still more evidence that the FDA knows that it is acting wrongfully.

**B.    The Connecticut Board Of Pharmacy Conducts A Snap Inspection Of SCA's Windsor Facility Two Days After This Court's Motion To Dismiss Hearing**

167.    The FDA appears to have escalated its pressure on state boards of pharmacy in response to further adverse developments in the case.

168.    On December 19, 2023, the Court heard argument the FDA's motion to dismiss. While the motion is still under advisement, the Court made several comments throughout the hearing that strongly suggested that the Court was inclined to deny the FDA's motion, at least in part.

169.    As the Court put it, SCA plausibly alleges "repeated—I'll put this in quote—recommendations and very brief deadlines set which the flavor literally is the flavor of an agency blackmailing a company into complying with a recall that the agency cannot statutorily order." ECF 60 at 11:3-8.

170.    The Court also suggested during colloquy that SCA had "lots of allegations that give rise to imminence" which are "undisputed"; "[t]here is no question that agency action has taken place"; "there is a plausible claim of final agency action"; "[t]he the FDA departed from the ordinary process"; SCA's quality control "process worked" because there was no "product out there that [the FDA] [has] evaluated and said is unhealthy or could cause death"; and that SCA had stated "a direct due process claim." *Id.* at 9:11-20, 16:23-25, 19:19-20, 22:1-7, 22:22, 74:11-20.

171.    Summarizing the FDA's counterarguments, the Court stated that dismissing SCA's original Complaint would leave the FDA "free to do whatever they can do to pressure a company into taking actions that the FDA cannot require them to take under the statute, and that will never be reviewed." *Id.* at 20:13-18.

172.    The Court ultimately ordered at the December 19 hearing that the FDA produce, for in camera inspection, limited jurisdictional discovery.   Specifically, the Court ordered that the FDA produce draft Section 705(b) Notice that has been written, along with "any written documents that suggest that there is an interest in issuing a press release or a public statement of some sort with respect to SCA's products in the period starting October 1st" through the present. *Id.* at 45:15-24.

173.    At 7 a.m. on December 21, less than 48 hours after the motion-to-dismiss hearing concluded and two days before a holiday weekend, five inspectors from the Connecticut Board of Pharmacy arrived at the Windsor Facility unannounced.

174.    The inspectors told SCA that they had arrived to do an inspection of the conditions giving rise to the FDA's Form 483 and SCA's response to the 483.

175.    In particular, the inspectors said they wanted to see what changes SCA had undertaken in its tote sanitization, pacing lights, sanitization training, and air sampling, and also to receive a general plant tour.

176.    This inspection appears to have been rushed and ad hoc, not planned long in advance.

177.    Despite inspecting SCA's compliance with applicable federal regulations, three of the five inspectors admitted to SCA that they had no knowledge of aseptic processing or 503B facilities.

178.    One of the inspectors had only just joined the Board of Pharmacy.

179.    The number of inspectors (five) was also unusually high.

180.    It appears to be no coincidence that this inspection came less than 48 hours after the motion to dismiss hearing.   On information and belief, following the Court's comments at the hearing and order to the FDA to produce discovery, the FDA encouraged the Connecticut Board of Pharmacy to initiate an immediate inspection of SCA's facility, both to inconvenience SCA and to backfill its original recall demand by coming up with new evidence to justify their arguments.

181.    This particular gambit did not work, however, because SCA does run a state-of-the-art facility and had already addressed the FDA's stated concerns.

182.    During their discussions at the end of the inspection, the inspectors confirmed that SCA remains in "good standing" with the Connecticut Board of Pharmacy.

183.    On December 27, the Connecticut Board of Pharmacy provided SCA with a letter confirming that SCA's "[l]icense is in good standing," and that SCA had "[n]o record of disciplinary actions."

184.    But the FDA was not finished.

**C.    The FDA Retaliates Against SCA By Preparing An HHE, After Denying That It Had Ever Prepared One**

185.    On Friday, January 12, 2024, following repeated prodding and inquiries by SCA, the FDA informed SCA at close of business that it had made an unspecified production of "discovery responses" to the Court for in camera review, in response to the Court's jurisdictional discovery order.

186.    After the SCA immediately asked the FDA for rudimentary information about the volume of documents produced, the FDA informed SCA that it had produced 11 documents totaling 34 pages for in camera review.

187.    The FDA's subsequent conduct suggests that the FDA produced incriminating documents that, at minimum, undermined its jurisdictional arguments for dismissal.

188.    The day after it produced jurisdictional discovery for in camera review, on Saturday, January 13—the middle of Martin Luther King, Jr. Day Weekend—the FDA emailed SCA reporting that it had completed an HHE for SCA's products based on the September-October 2023 inspection from 3-4 months earlier.

189.    The HHE █████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

190.    The circumstances surrounding the HHE are extraordinarily suspect and afford strong indication that the FDA manufactured the HHE—weeks and months after the fact—specifically to retaliate against SCA for filing this action.    The HHE afforded a new weapon that the FDA could use to malign SCA in public, as outlined below; provided a post-hoc justification for its prior baseless recall demand that it otherwise would have lacked; and now sits in the FDA's files as another loaded gun, one that any requester can now potentially turn up and weaponize via a Freedom of Information Act ("FOIA") request, or that a state regulatory authority can require SCA to disclose and then publish itself.

191.    The FDA had previously strongly suggested, if not outright stated, that it had not prepared an HHE.

192.    The Court specifically asked the FDA at the December 19 hearing whether the FDA had prepared an HHE before demanding SCA's recall.    *See* ECF 60 at 12:24-25.

193.    The FDA's counsel responded by giving every impression that no such HHE had ever been prepared.    *See id.* at 12:24-25, 13:10-18 ("And I think that the HHE, your Honor, that that's something that's triggered—that's something that's triggered by regulation for the FDA formally requested recall process which is in 21 CFR 7.45.    But that's something, again, where SCA doesn't allege that the FDA was even at the point that it was going to undertake that formally requested recall process.    In other words, where we were in the regulatory sort of timeline was proceeding this.").

194.    When the Court proceeded to refer to the FDA as "not . . . having an HHE," the FDA did not correct the Court.    *See id.* at 23:4-22.

195.    The FDA's December 19 representations appear contrary to the facts well known to the FDA, and only to the FDA.

196.    The face of the HHE indicates that the FDA completed a signed HHE on **December 13**, six days before the FDA appeared to indicate that there was no HHE.

197.    Without explaining this discrepancy, the FDA has denied that the December 19 HHE colloquy ever occurred. ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

198.    But the record is clear:  The FDA misled SCA and the Court in the December hearing about the existence of the HHE, then later misled the Court about this misrepresentation in the January hearing.

199.    There is, in fact, some reason to believe that the FDA altered its first signed HHE to prejudice SCA.

200.    The revised HHE states: ████████████████████████████
████████████████████████

201.    ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

202.    ████████████████████████████████████
████████████████████████████████████████████████████
██████████

203.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████.

204.    Beyond these misrepresentations, the timing of the HHE compounds concerns.

205.    The FDA commenced the process for preparing an HHE on **December 8**—a full month after the FDA had requested a recall and SCA had undertaken a limited recall, well after the Court signaled its initial view that SCA's complaint should withstand a motion to dismiss, less than a week after SCA reported the FDA's circumvention of the Standstill Agreement and Standstill Order on **December 4**, and three days after SCA filed its opposition to the FDA's motion to dismiss on **December 5**.

206.    The FDA then revised the HHE on **January 10, 2024** (effectively on the eve of the FDA producing documents for this Court's in camera review), before sharing it with SCA three days later, amidst a holiday weekend.

207.    This timeline is nothing short of alarming.   Unfortunately, it is part and parcel of the FDA's pattern of retaliating against SCA in response to adverse judicial developments.   Nor has the FDA offered any plausible explanation for its actions and their timing in the face of pointed concerns expressed by SCA and by the Court.

208.    That at least one draft of the HHE was completed before the FDA's production also calls into question the completeness of the FDA's production of jurisdictional discovery to the Court.

209.    To be clear, SCA cannot know what documents the FDA provided to the Court.

210.    But SCA understands from the Court's and the FDA's comments at the two January 17, 2024 hearings that the HHE was *not* among the documents produced.

211. The Court's order required the FDA to produce all documents, from October 1, 2023, through the present, "that reflect an intention or a plan or preparations for the issuance of a statement regarding SCA's products."   ECF 60 at 47:20-22.

212. The HHE—by stating that ███████████████████████████ ████████████████████████████████████████████—should ostensibly have been produced under the Court's order.

213. If the FDA failed to produce the HHE, it only calls into question what other relevant documents the FDA chose to withhold and its forthrightness with the Court.   Such lack of forthrightness also bespeaks the FDA's bad faith and its desire to retaliate against SCA outside of court for SCA's success to date in court.

214. The timeline also refutes the HHE's findings that ████████████████ ████████████████████████████████████████████████ ████████████████████████████████

215. As the Court noted in its TRO (discussed further below), ████████████ ████████████████████████████████████████████████ ████████████████████████████

216. The HHE, moreover, purported to arrive at this conclusion based on observations it made in its September–October 2023 inspection—three months before the HHE issued—and purported misconduct going back to *2019*.

217. The FDA's delay in issuing this HHE bespeaks a lack of public health emergency, contrary to the HHE's purported findings.

218. The HHE on its face, moreover, is substantively defective. ████████████ ████████████████████████████

219. 

220.

221.    The Court elaborated on its concerns when explaining its decision to issue a TRO from the bench:



222.    Finally, the FDA has inexplicably treated SCA differently from similarly situated companies.

223.    On September 28, 2023, the FDA requested that Pine Pharmaceuticals, LLC, another 503B facility, recall all aseptically filled drugs intended to be sterile that failed one round of testing, and all of a certain category of products.

224.    This recall demand was made approximately a month before the FDA made its recall demand of SCA, and so any HHE should have been prepared before SCA's HHE was completed.

225.    But, as of January 25, 2024, the FDA had confirmed to Pine Pharmaceuticals that it still had not completed an HHE.

226.    The decision to create an HHE for SCA, before completing one for an earlier recall, is evidence of retaliatory intent to treat SCA differently than similarly situated companies.

227.    The FDA's misrepresentations about the existence of the HHE, its suspicious timing in preparing and sharing the HHE with SCA and the Court, the facial defects in the HHE's substance, and the FDA's failure to prepare an HHE for a similarly-situated company that issued a recall a month earlier than SCA, are all strong evidence that the FDA prepared the HHE to retaliate against SCA, either by publishing it directly; preparing it with the expectation either that one of SCA's commercial rivals would obtain the HHE by a FOIA request and share the HHE itself, or that a state board of pharmacy would obtain the HHE and publish it; or simply using the HHE to backfill and provide a post-hoc justification for its initial defective recall demand and Section 705(b) Notice.

**D.    The FDA Retaliates Against SCA By** ████████████████████████████
████████████████████████████████████████████████████████████

228.    The FDA then escalated further by threatening SCA with ████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

229.    When the FDA sent the copy of the HHE to SCA on January 13, its email stated that it was providing the HHE "[a]s a courtesy," and offered "on Wednesday, January 17, 2023,"—

*i.e.*, **two business days after the FDA sent the HHE**—"from 10am-2pm, to hear any concerns you may have about the HHE and to discuss any next steps for your recall."

230.    On January 16 (the first weekday after it had received the HHE), at 7:46 a.m., counsel for SCA responded to the FDA's email.  SCA confirmed receipt of the HHE and welcomed a meeting with the FDA but emphasized that its principals and personnel could not "possibly digest the HHE and be prepared to meet" by the very next day.

231.    SCA proposed that they meet the week of January 22 instead, to ensure that SCA's principals would be able to attend the meeting and respond in substance to the HHE.

232.    SCA also previewed that it had "grave concerns about the HHE, including the peculiar timing of the initial draft (which was prepared months after the inspection concluded, weeks after the recall was requested, and days before the motion to dismiss hearing), followed by the FDA's revisions last week."

233.    SCA concluded its email by requesting that the FDA "please confirm that the FDA will continue to stand still, as agreed (and as presumably reflected in the FDA's inclusion of the HHE as part of the package the FDA submitted solely for the Court's in camera review), such that the FDA will not publicly release or share the HHE or any version or account of same before so alerting the Court and SCA."

234.    The FDA never responded to SCA's request that it affirm that it would continue to abide by the standstill, even as it continued to email with SCA's counsel throughout the day.

235.    At 8:12 a.m., SCA requested that the FDA respond to its earlier request that it provide SCA the discovery it submitted to the Court.

236.    The FDA declined at 10:25 a.m.

237.    SCA reserved all rights and requested again, at 11:39 a.m., that the FDA affirm the standstill.   The FDA did not respond.

238.    SCA and the FDA exchanged two additional emails apiece between 3:28 p.m. and 5:24 p.m. regarding SCA's renewed motion for discovery, but the FDA did not mention the standstill.

239.    Then, suddenly, at 6:24 p.m. Eastern time (after close of business), the FDA emailed the Court "notice of changed circumstances in this matter" that "will result in a public disclosure of information regarding the FDA's inspection, conducted from September 18 to October 20, 2023, of Plaintiff's Windsor, Connecticut outsourcing facility," and enclosed the HHE.

240.    Its letter informed the Court that, now that the HHE was completed, ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

241.    ███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

242.    ███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

243.    ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████

244.    The FDA has never explained why it withheld such critical information and any meaningful notice of what it was intending to do, in violation of the Standstill Order, the very next day.

245.    The FDA's letter made clear that the FDA would , the very day that the FDA had proposed a meeting with SCA to discuss the HHE.

246.    By all indications, the FDA thus never had any real intention of discussing the HHE's contents but was treating the HHE as a fait accompli.

247.     was ultra vires and contrary to the FDA's own pledges.

248.    

249.    

250.



---

E.    **The Court Issues A TRO** ███████████████████████████████████

251.    SCA immediately wrote to the Court that the FDA had "caught [it] completely by surprise with its threatened publication," made clear its disagreement with the HHE and SCA's conclusions, called attention to the FDA's "brazen violation of the standstill," and noted that the FDA appeared to be telegraphing, without saying outright, that ███████████████████ ████████████████

252.    The Court accordingly scheduled an emergency hearing at 9:00 a.m. on January 17.

253.    ████████████████████████████████████████████████ ████████████████████

254.    On information and belief, absent judicial intervention, ████████████████ ████████████████████████████████████████████████ ████████████████████

255.    Shortly before the hearing, SCA filed a renewed motion for a temporary restraining order.

256.    Despite the fact that the FDA was set to publish ████████████ that very day, the FDA represented at the 9:00 a.m. hearing that █████████████████████████████████ ████████████████████████████████████

257.    The FDA maintained that the Standstill Agreement and Standstill Order did not bar its public notice, which, according to the FDA, would pertain only to SCA's Limited Recall.

258.    That was disingenuous.

259.    The FDA's original letter to the Court referenced the Standstill Agreement and Standstill Order and stated that the notice "will result in a public disclosure of information

regarding the FDA's inspection, conducted from September 18 to October 20, 2023, of Plaintiff's

Windsor, Connecticut outsourcing facility."

260.    The FDA had also previously denied that a "Section 705(b) Notice" was part of the

FDA's "vernacular," only to now claim that a Section 705(b) Notice was special and distinct from

███████████████████████████████.    ECF 32-1 at 1.

261.    The Court adjourned the hearing until the afternoon to give the FDA time to

ascertain ███████████████████████, and ordered that the FDA not make any public

statements in the interim.

262.    The Court made clear, however, that it was troubled by the FDA's actions, which

appeared designed ████████████████████████████████████████████████████

████████████



*Id.* at 18:18–19:11 (emphases added).

263.    At 11:50 a.m., the FDA notified the Court that, an hour earlier, it had ████████

███████████████.  █████████████████████████████████████████████

████████████████████████████████████    █████████████

███████████████████████████████████████

264. ███████████████ was retaliatory and arbitrary and capricious.

265. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

266. But the FDA inexplicably allowed these products to remain on the market for 3-4 months, without taking any actions or suggesting it needed any relief from the Standstill Agreement and Order.

267. Moreover, the FDA adamantly maintained before this Court that it had no intention of publicizing anything adverse to SCA and that SCA had no good basis for fearing otherwise.

268. These known facts thoroughly indict the FDA's HHE ████████████████.

269. Nor can the FDA justify a ████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

270. ████████████████████████████████████████████████████
████████████████

271. SCA has reviewed all ████████████████ for 503B facilities and pharmaceutical companies over the past ten years and found no instances in which a ████████████████████
████████████████████████████████████████████████

272. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

---

59

273.    

274.

275.    The Court held another hearing at 1:00 p.m.

276.    The Court expressed its concerns that there were no changed circumstances since the Standstill Agreement and Standstill Order had gone into effect, as the HHE was based on a 3–4-month-old inspection and reflected no evidence of actual threats to human health.

277.    The Court asked whether the FDA would agree to continue abiding by the Standstill Agreement, decline to issue ▬▬▬▬▬▬, and maintain the status quo pending a mediation with a magistrate judge.   Because the FDA refused, the Court heard argument on whether a TRO should issue barring the FDA from publishing ▬▬▬▬▬▬ or any such statement.

278.    After hearing responsive arguments from both sides, the Court issued a TRO from the bench, which it memorialized in an opinion issued shortly after the hearing ended.

279.    The TRO found that the 

280.    The FDA also failed to provide the Court with sufficient notice before making a public statement, in breach of the Standstill Order.

281.    The Court was, in turn, ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ that it would make a public notice only about the Limited Recall and not the

FDA's preferred total recall, a deeply unfortunate reflection of the FDA's failure to be forthright in its dealings with SCA and the Court.   *Id*. at 8.

282.   ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████.

283.   Finally, the TRO found that ████████████████████████████

████████████████████████████



████████████████████████████████ The Court did not need to reach the merits of SCA's APA claims, because SCA's plausible due process claim provided sufficient merits justification for granting a TRO.

### F.   Colorado Issues A Disciplinary Letter Against SCA After The TRO Enters

284.   Despite the issuance of the TRO, the consequences of the FDA's retaliatory conduct have continued to ripple at SCA's expense.

285.    On January 22, 2024, the Colorado Board of Pharmacy—which had received the FDA's communications regarding this case, as discussed *supra*—sent SCA a letter, backdated to January 19, 2024, stating that it had "concluded its inquiry into" the FDA's 483 observations.

286.    While the board decided "not to commence with formal proceedings against your professional license," it issued a "letter of admonition," which became part of the public record and was reviewable "to individuals or entities requesting disciplinary information."

287.    The letter did not specify any laws, regulations, or best practices that SCA had violated.

288.    Upon information and belief, based on its past practice in this case, the FDA prompted the Colorado Board of Pharmacy to proceed against SCA because the FDA was displeased by developments in this litigation.

***

289.    The FDA has refused all entreaties to resolve this matter on fair, reasonable, factually based terms.  Its unlawful actions cannot be stopped or remedied short of this Court awarding SCA declaratory and injunctive relief preventing continued violation of SCA's rights.

## CLAIMS

### COUNT I
**Violation of the Administrative Procedures Act, 5 U.S.C. § 706(a)
(Arbitrary and Capricious for Lack of Explanation)**

290.    SCA incorporates herein by reference the preceding paragraphs 1-289 of this Amended Complaint as if fully set forth in this paragraph.

291.    The FDA's imminent Section 705(b) Notice, recall demand, HHE, and ███ ███████ are all final agency actions.

292.    The FDA has affirmatively and definitively stated it has found SCA to have insanitary conditions.  The imminent public announcement is set to be issued pursuant to the FDA's definitive judgment that the drugs at issue ██████████████████████████.

293.    The FDA's imminent Section 705(b) Notice, recall demand, HHE, and ███████ ████████ would have an immediate impact on SCA's day-to-day operations.  The FDA's warning to SCA's customers and patients to stop using SCA products will have concrete, devastating effects on SCA's business, reputation, and goodwill.  And complying with the FDA's recall demand would destroy the FDA's business.

294.    SCA has no further obligation to exhaust administrative remedies.  The FDA will not afford SCA a further opportunity to discuss or seek recourse from the FDA's decision within the agency itself.  To the contrary, the FDA has demanded complete, unconditional acquiescence by SCA.

295.    The FDA has provided no explanation of the standards that it applied to conclude that its 483 observations of SCA's Windsor Facility amount to insanitary conditions under the FDCA or merit a ██████████████.

296.    The FDA has provided no explanation of its conclusion that SCA's products pose an █████████████████████████████ or violate cGMPs.

297.    The FDA has provided no explanation of the standards that it applied to conclude that all of SCA's Windsor Facility products within expiry should be recalled, rather than a targeted set of products.

298.    The FDA has no evidence that any of SCA's products were adulterated due to insanitary conditions.

299.    The FDA has not given any consideration to the obvious risk that its Section 705(b) Notice would itself pose an imminent danger to ongoing public health and patients who rely on SCA's products.   The Section 705(b) Notice, recall demand, HHE, and ██████████ will immediately remove from circulation safe drugs that are in shortage nationwide, depriving patients of the drugs they need, and forcing them to rely on hospitals and healthcare facilities to provide the same services SCA provided, albeit in a much less regulated, much more dangerous environment.

300.    The FDA's decision to find that SCA had insanitary conditions and its imminent Section 705(b) Notice, HHE, and ██████████ are bereft of any reasonable explanation of the specific analysis and evidence upon which the FDA is relying.   The FDA's statements and explanation reveal no rational connection between the facts found and the choice made by the agency.   And all three final agency actions are substantively arbitrary and capricious.

301.    The FDA has treated SCA differently from similarly situated companies, including Baxter, Eugia, and Pine Pharmaceuticals, without any valid justification for this differential treatment.

302.    The circumstances surrounding the Section 705(b) Notice, HHE, and ██████ ██████ are also highly suspicious, undermine the substantive bases for the FDA's actions, and bespeak bad faith on the FDA's part.   The FDA denied in open court that an HHE had been prepared when it had (either because the initial HHE undercut its findings or was so weak that it undercut its ripeness arguments without strengthening its merits arguments); the FDA took months to conclude that the conditions giving rise to its recall demand and Section 705(b) Notice posed a fatal risk to human health, illustrating a lack of urgency); the FDA treated SCA differently from other companies in preparing the HHE; and the HHE was facially defective ██████████



303.    The FDA has also deprived SCA of any opportunity to respond to the purported violations listed within the 483 within the 15-business day deadline.    The FDA's rush to judgment is entirely arbitrary and capricious, given that (1) the FDA has been aware of, and had no issues with, many of the purported quality control issues since its inspection of the Little Rock Facility in May 2023; (2) the FDA raised no concerns during its fifteen-day on-site inspection; (3) the FDA did not demand the closure and recall based on the 483 observations for 13 days after issuing the 483; (4) the FDA denied SCA the HHE that would be the predicate for its recall demand; and (5) the FDA's actions violate the FDA's own regulations and procedures.

**COUNT II**
**Violation of the Administrative Procedures Act, 5 U.S.C. § 706(a)**
**(Contrary to Law & Arbitrary and Capricious in Substance)**

304.    SCA incorporates herein by reference the preceding paragraphs 1-303 of this Amended Complaint as if fully set forth in this paragraph.

305.    By all indications, the FDA's recall demand relies on unspecified, anomalous, and heightened standards that are foreign to the governing legal standards.    To make matters worse, the FDA is purporting to treat legal guidance that it has described as "non-binding" as not only binding but also enforceable via 705(b) Notice, amounting to a corporate death penalty.

306.    The FDA's improper application of made-up standards is clear on the face of the 483.   A number of its observations, and every single observation it cited en route to demanding the recall and closure, cite conduct or conditions at SCA that do not violate federal statutes or regulations.   Indeed, the Form 483 does not even attempt to trace the cited standards by which SCA is being judged to any established source—in statute, regulation, or otherwise.

307.    As such, the only explanation available from the FDA contravenes statutory prescription from Congress combined with the agency's own avowed position that its relevant guidance is "*non*-binding."   To proceed in such fashion is the height of arbitrariness and caprice, and it contravenes governing law.

308.    The FDA has treated SCA differently from similarly situated companies, including Baxter, Eugia, and Pine Pharmaceuticals, without any valid justification for this differential treatment.

309.    Finally, the FDA has violated its own regulations and procedures by demanding a recall without preparing an HHE, not giving SCA sufficient time to respond to its 483, and by issuing ████████████████████████████████████████████████████████    An agency's failure to follow its own rules and internal operating procedures is arbitrary and capricious.

## COUNT III
### Due Process

310.    SCA incorporates herein by reference the preceding paragraphs 1-309 of this Amended Complaint as if fully set forth in this paragraph.

311.    The Fifth Amendment's Due Process Clause requires that a regulated entity be afforded due process before it can be deprived of life, liberty, or property.   This entails, *e.g.*, notice that is reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the action, along with an opportunity at least to present their objections and have them heard.

312.    Courts have long recognized that a government pronouncement that stamps a citizen or company with a badge of infamy and destroys its reputation deprives a person of its liberty interest under the Due Process Clause, thus requiring meaningful notice and the opportunity to present one's objections and be heard.

313.    The FDA's imminent Section 705(b) Notice will inflict a deprivation under this precedent, particularly given that it would predictably extinguish or at least cripple SCA's entire business.

314.    ██████████████████ would also, but for judicial intervention, have inflicted a deprivation under this precedent, particularly given that it would predictably extinguish or at least cripple SCA's entire business.

315.    The FDA has deprived SCA of constitutionally requisite notice and opportunity to present its objections.    Despite taking a month to investigate the Windsor Facility and two weeks after its 483 notice before presenting its recall and shutdown ultimatum, the FDA first demanded a recall within 24 hours and later extended the timeline to two business days total.    At no time has SCA been able to respond substantively and ventilate its objections.    Indeed, the FDA is not even affording SCA the *15 days* that the FDA *told* SCA would be available for responding to the *underlying 483*.    Such an approach of "sentence first, verdict afterwards" belongs in Alice in Wonderland; it has no place in the United States and is antithetical to due process.

316.    The FDA's ██████████████ also deprived SCA of constitutionally requisite notice and opportunity to present its objections.    ██████████████████████████
██████████████████████████████████    Instead, it issued it 3 months after

receiving all such information.   And then, despite its own delays, it afforded SCA *zero* process to challenge ████████████████████████████ in advance of it issuing only when ordered by the Court.

317.    Finally, the FDA has violated its own regulations and procedures by demanding a recall without preparing an HHE, not giving SCA sufficient time to respond to its 483, and by issuing ████████████ months after its mandated 5 working-day deadline.

318.    An agency violates due process when it fails to follow its own procedures and regulations.

## COUNT IV
## First Amendment Retaliation

319.    SCA incorporates herein by reference the preceding paragraphs 1-318 of this Amended Complaint as if fully set forth in this paragraph.

320.    SCA has engaged in protected activity by filing this lawsuit.

321.    The FDA has adversely acted in response by encouraging state regulatory bodies to investigate and punish SCA by issuing an HHE and ████████████ that were demonstrably baseless, improper and in violation of the FDA's regulations and procedures.

322.    Amidst the context of the FDA's past practice, the FDA's retaliatory actions will deter SCA and other regulated entities from continuing to challenge the FDA's agency actions in court.

323.    The FDA intentionally retaliated against SCA due to its prior First Amendment activities, including as reflected in this lawsuit and this litigation.

324.    The FDA's intent to retaliate against SCA is apparent from the belatedness of these actions, the substantive unreasonableness of them relative to all known facts, their unprecedented and irregular nature, and the FDA's differential treatment of SCA.

325.    The FDA would not have decided to encourage state enforcement action and to issue the HHE and ███████████ when and as the FDA did but for the FDA's retaliatory motive and intent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SCA respectfully prays for judgment and relief against Defendants as follows:

1.    An order enjoining the FDA from printing or publishing any press release, 705(b) Notice, notice, or statement regarding its investigation of SCA;

2.    An order enjoining the FDA from making any statements or issuing any communications to any other regulatory body, state or federal, regarding its investigation of SCA;

3.    A declaratory judgment that the FDA's adverse actions against SCA are unfounded and unlawful;

4.    Any other relief the Court deems just and appropriate.

Dated:  February 16, 2024                    Respectfully submitted,

*/s/ Derek L. Shaffer*
Derek L. Shaffer (*pro hac vice*)
QUINN EMANUEL URQUHART &
      SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
Phone: (202) 538-8000
Fax: (202) 538-8100
Email: derekshaffer@quinnemanuel.com

Alex H. Loomis (*pro hac vice*)
QUINN EMANUEL URQUHART &
      SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Phone: (617) 712-7100
Fax: (617) 712-7200
Email: alexloomis@quinnemanuel.com

Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
Goodwin Square, 225 Asylum St,
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

*Attorneys for Plaintiff*
*SCA Pharmaceuticals, LLC*

## **VERIFICATION OF COMPLAINT**

I, Racheal Adams, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I am the Chief Pharmacy Officer ("CPO") of SCA Pharmaceuticals, LLC ("SCA"). I am a founding member of SCA since its inception in 2011 and have been in the role of CPO since October 2021.   As such, I have full authority to verify the foregoing Verified Complaint on behalf of SCA.

I have read the foregoing Verified Complaint, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 16, 2024
in Little Rock, Arkansas.

Racheal Adams

Chief Pharmacy Officer
*SCA Pharmaceuticals, LLC*